**FARMLAND MUTUAL INSURANCE COMPANY, Respondent,**

**Frank Gentile, Appellant.**

**Nos. C5–83–2003, C5–84–52.**

Supreme Court of Minnesota.

Jan. 9, 1985.

## ORDER

Based upon all the files, records and proceedings herein,

IT IS HEREBY ORDERED that the petition of Farmland Mutual Insurance Company for further review of the decision of the Court of Appeals be, and the same is, granted. Briefs shall be filed in the quantity, form and within the time limitations contained in Minn.R.Civ.App.P. 131 and 132. Counsel will be notified at a later date of the time for argument before this

**Leo William NORD, deceased, by Marion Nord, petitioner, Respondents,**

v.

**CITY OF COOK, d.b.a. Cook Community Hospital, Self-Insured, Relator,**

**and**

**Blue Cross and Blue Shield of Minnesota, Intervenor.**

**No. C3–84–650.**

Supreme Court of Minnesota.

Jan. 11, 1985.

Richard L. Plagens, Minneapolis, for relator.

James P. Paciotti, Duluth, for Nord.

Indure S. Advani, St. Paul, for Blue Cross & Blue Shield of MN.

AMDAHL, Chief Justice.

This action arose from a claim petition for dependency benefits filed by Marion Nord after her husband, Leo Nord, died of a heart attack on October 27, 1980. Compensation Judge James Otto found that the dependents had not shown by a preponderance of the evidence that Leo Nord's heart attack arose out of his employment or that his employment activities contributed to, aggravated, or accelerated his heart attack. The dependents appealed the compensation judge's decision to the Workers' Compensation Court of Appeals (WCCA). In a 2–1 decision, the WCCA reversed the findings of the compensation judge for lack of a substantial evidentiary basis. The WCCA then substituted for the findings of the compensation judge its own findings that the dependents had shown by a preponderance of the evidence that Leo Nord's heart attack both arose out of his employment and was significantly aggravated or accelerated by his employment. We must determine (1) whether the WCCA applied the correct standard of review in reviewing the findings of the compensation judge, and (2) whether the WCCA was correct in setting aside the findings of the compensation

judge and substituting its own findings in their stead. We affirm.

Leo Nord began working for Cook Community Hospital in 1965 as a maintenance engineer. The job involved electrical work, plumbing, carpentry, mechanical repairs, and painting. Nord was responsible for maintaining the hospital grounds by mowing the lawn, trimming hedges, and shoveling snow. The hospital was subject to inspection by government agencies, and Nord was required to repair any cited deficiencies that involved plant maintenance. The compensation judge took judicial notice that some of these jobs require physical exertion.

Nord was assisted in his work by Robert Mueller, who was also a full-time employee of the hospital. The men worked together 3 days per week; only one of them worked the other 4 days. Nord and Mueller divided their workload as they wished, but if one was absent or on vacation, the other had to get all of the work done. The job required that one man be on call any time neither man was working. Nord took much more on-call duty than Mueller because he lived near the hospital and could get there faster than Mueller, who lived 30 miles away. Nord was frequently called to the hospital to check on something on his days off. When either Mueller or Nord was on vacation or sick leave, the other man worked consecutive days until his co-worker returned.

Nord was known as a conscientious, dedicated worker. He was 65 years old when he died in 1980. He was an active man, was not overweight, and was in good health. Nord had not been under medical treatment for 10 years and had no history of high blood pressure, diabetes, or heart disease. None of his close relatives had any history of heart trouble. He had no family problems, financial worries, or domestic tensions in the half-year preceding his death.

In the fall of 1980, there were two time periods when Mueller was absent from work for several days. Mueller was on sick leave and hospitalized in late August and early September. During this time, Nord worked alone for 9 straight days. The hospital administrator offered Nord additional help while Mueller was sick, but Nord replied that since Mueller would soon return to work, it would be more difficult to train a new person than to do the work himself. Nord's wife testified that Nord came home tired during the time he worked 9 consecutive days. Nord had been planning a vacation, but deferred it when Mueller became ill. Mueller was absent from work for the second time in October 1980. Mueller took a vacation in the middle of the month, with the result that Nord was scheduled for 10 consecutive days of work, from October 18 to October 27.

When Nord worked over 6 consecutive days, there were usually days where the work overlapped with Mueller's workdays. The hospital administrator testified that, over the years, the maintenance men often worked several consecutive days and that 1980 was not different in this respect. Mueller testified that he had once worked 21 straight days alone. Nord's 1980 work pattern shows that, except for the two periods of Mueller's absence in the fall, whenever Nord worked 6 or more consecutive days, Mueller worked with Nord at least 3 days.

Nord worked alone 7 consecutive days, from October 18 to October 24, 1980. He was scheduled to work alone the 25th, 26th, and 27th as well. There is conflicting evidence on whether Nord worked at the hospital on Saturday, October 25, 1980. Mrs. Nord testified that Nord did work on that day. They ate breakfast together, and he left for work at 7:45 a.m. He returned home for lunch at noon and left for work again at 12:30 p.m. He arrived home for supper around 5 p.m. William Nord testified that he saw his father's car parked at the hospital when he drove into town at 10:30 a.m. He also saw his father's car parked by the hospital loading zone and boilerroom when he again traveled into town at 2:30 p.m. The hospital introduced a copy of Nord's timecard from that week signed by Nord which had no time filled in

on Saturday, October 25. Nord's timecard for Sunday, October 26, was also not filled in by Nord; it was, however, filled in by a hospital administrator. There is no dispute Nord worked on Sunday. The hospital administrator said that employees get their timecards ahead of time and can fill them out or sign them anytime during the pay period. The timecard is the only documentary record of when a hospital employee has worked; Nord was not required to sign in, punch in, or report to anyone when arriving at work.

In the week prior to his death, Nord told his wife that his work was "getting to him." Nord's wife testified that when Nord came home from work on Saturday, he said that he had had a hard day and was tired. He fell asleep in his chair after supper with the paper over his head. He then went to bed and slept until 9 p.m., woke up, visited with his wife for a while, and then went to sleep again at 11 p.m. His wife and son testified that he did not appear to be sick or in pain and had no apparent difficulty sleeping that night.

Nord awoke at 7 a.m. on Sunday, October 26, had breakfast, and went to work at 7:45 a.m. He did not look sick or ill and did not complain of a poor night's sleep. He returned home at 12:30 p.m., ate his usual dinner, looked at the paper, and returned to work at 1:30 or 2 p.m. Again, he did not look any different to his wife. A registered nurse, Ms. Ryan, who reported for work at 4 p.m. that Sunday, testified that shortly after she arrived at work, Nord came into the nurses' lounge, said he was ill, and asked for help. The nurses present put him into a wheelchair and took him to the emergency room. He told Ryan in the emergency room that he had felt ill earlier and had sat down until he felt better.

Nord was transferred to the Virginia Regional Medical Center later that day, and the admitting physician reported that—

> Mr. Nord is a 65-year-old maintenance man at Cook Hospital. He states that he began experiencing some ill defined chest discomfort yesterday, then at work today during the course of his customary duties with exersion [sic], he developed a dull pain in his chest which radiated to his back and especially between his shoulder blades and also experienced some pain in his jaws. He noted that this pain was exacerbated whenever he [did] any sort of work and [then] resolved after 5–10 minutes of rest. He continued doing his customary duties at work until an episode of chest pain which was associated with severe cold diaphoresis [sweating]. He also states that there was some mild nausea associated with this, but no shortness of breath or cough. He presented to the nurses station at the Cook Hospital and was evaluated by a Dr. Johnston at that hospital.
>
> \*   \*   \*   \*   \*   \*
>
> He denies any significant past medical history or symptoms of angina in the past except within the last 24 hour period.

Mr. Nord was suffering from acute anterior myocardial infarction, caused by coronary artery disease. As coronary arteries narrow over the years, the heart must work harder to deliver a sufficient supply of blood to the heart muscle. When the demand for blood exceeds the ability of the arteries to supply blood, heart tissue dies from lack of an adequate blood supply. The result is called an infarct. Leo Nord died from this condition on Monday, October 27, 1980.

No one knows exactly what work projects Nord was performing on Sunday when he experienced chest pain and suffered his myocardial infarction. The hospital administrator testified that she had instructed Mueller and Nord not to take on new projects on Sunday, but to simply be available to solve problems. She testified that Nord often did paperwork on Sundays. Nord's wife testified that Nord never indicated that he took it any easier on Sundays and that he often did projects that were inconvenient to do during the week. Mueller testified that on Sundays, he and Nord usually cleaned the boilerroom and the incinerator because that was the only day they did not burn trash in the incinerator.

The cleaning of the incinerator usually involved 45 minutes of shoveling and sweeping. Cleaning the boilerroom usually required 1½ hours of work, and included some time on a stepladder.

Two medical experts came to opposite conclusions about whether Nord's myocardial infarction arose from or was caused by his employment. Dr. Barron testified that the work Nord was doing, and the emotional stress of working alone without backup for 9 straight days and being on call 24 hours a day, were "significant factors in producing his coronary attack and subsequent death." Dr. Barron testified that the stress of consecutive days of work, being on call 24 hours a day, and the fact that Nord was a conscientious worker, added to the problems his work was causing his heart. Because Nord reported no pain prior to work, Dr. Barron concluded that the evidence suggested a relationship between pain and work. The doctor noted that Nord reported on Sunday that he experienced pain upon exertion and that the pain eased with rest. The doctor testified on cross-examination that the particularly significant facts to him were Nord's 9 consecutive days of working alone and that the pain occurred with exertion. The doctor did not assume that Nord was doing more than his normal workload in the last days before he died.

Dr. Arnold testified that Nord's death was caused by coronary artery disease and that there was no relationship between Nord's work and that underlying disease. The doctor said there was no indication that Nord's work caused a substantial increase in demand for blood flow and that the medical record showed that Nord had experienced 24 hours of intermittent chest pain upon any activity, not just work. The doctor said that his opinion assumed that the pain started on Nord's day off, Saturday, that Nord experienced intermittent pain for 24 hours, and that Nord was under no emotional distress at the time. He stated that exertion had no bearing upon when Nord's condition appeared and that it would be unusual for a person's normal workload to cause an infarction. He concluded that the infarct would have occurred no matter what Nord did.

1. In *Hengemuhle v. Long Prairie Jaycees,* 358 N.W.2d 54 (Minn.1984), this court set forth the standard of review the WCCA should apply under the 1983 amendments to the Workers' Compensation Act:

> The court of appeals can no longer disregard the compensation judge's findings and order. The court of appeals, instead, determines if the findings and order are supported by substantial evidence in view of the entire record as submitted. If the findings and order are so supported, the court of appeals affirms. If not, then, in that event only, the court of appeals may substitute its own findings, or it may remand to the compensation judge for a rehearing.

*Hengemuhle,* 358 N.W.2d at 59.

▉ In its opinion reversing the findings of the compensation judge, the WCCA did comment once that those findings were manifestly contrary to the evidence. In *Hengemuhle,* this court ruled that the manifestly contrary to the evidence standard of review "is not to be used by the Workers' Compensation Court of Appeals." *Hengemuhle,* 358 N.W.2d at 61 n. 5. The WCCA, however, concluded its examination of the record as follows:

> When one reviews the evidence of record in light of the petitioner's burden of proving her claim by a preponderance of the evidence and in light of this Court's function of determining whether there is a substantial evidentiary basis for the Compensation Judge's decision one can only conclude that the petitioner did in fact meet her burden of proof and that there is no substantial evidentiary basis for the Compensation Judge's decision. The mere fact that an adverse medical opinion relates that the employment was not a causative factor in the myocardial infarction is of no substantial weight when one considers the chronology of events, medical history and information obtained from the employee immediately

following his infarction, and the medical opinion in support of petitioner's claim. The WCCA did apply the correct standard, the substantial evidence test, in reaching its conclusion.

■ 2. In *Hengemuhle*, this court commented that—

> When a case comes to us for review of substituted findings made by the Workers' Compensation Court of Appeals, we will have before us two broad issues: First, whether the [WCCA] was correct in setting aside the compensation judge's findings; and, second, if those findings were properly set aside, whether the substituted findings of the [WCCA] should be affirmed. The scope of our review on these two issues will be under the "manifestly contrary to the evidence" standard, viewing the facts in the light most favorable to the findings before us, keeping in mind, however, that when we are reviewing substituted findings, this court is then acting as the first, as well as the final, reviewer of the substituted findings.

*Hengemuhle*, 358 N.W.2d at 61. The findings of the compensation judge are to be affirmed if they are supported by evidence a reasonable mind might accept as adequate. The WCCA should consider the evidence which supports the compensation judge's findings, opposing evidence, and evidence from which conflicting inferences can be drawn. The WCCA, however, must give "due weight to the opportunity of the compensation judge to evaluate the credibility of witnesses." *Id.* at 59. Where more than one inference may reasonably be drawn from the evidence, the compensation judge's findings shall be upheld.

Under the *Hengemuhle* test, it must first be determined whether the WCCA was correct in concluding that the findings of the compensation judge lacked substantial evidentiary support. The WCCA reversed the compensation judge's findings as lacking substantial evidentiary support because it found substantial evidence showing that Nord did work a full day on Saturday, October 25, and because the compensation

judge gave no weight to the description of Nord's symptoms in Nord's hospital admission record. In that report, Nord explained to his doctor that the chest pain occurred upon exertion on the job and subsided with rest. The WCCA also noted that Nord had no history of heart trouble, had worked 9 consecutive days, had come home from work tired on Saturday (and did not appear ill or in pain that night), had said earlier in the week that his job was getting to him, and that Nord's typical Sunday tasks involved 45 minutes of shoveling ashes out of the hospital incinerator and an hour and a half of cleaning the boilerroom. The WCCA concluded that an adverse medical opinion that Nord's employment did not cause his myocardial infarction "is of no substantial weight when one considers the chronology of events, medical history and information obtained from the employee immediately following his infarction, and the medical opinion in support of petitioner's claim."

■ Some facts support the compensation judge's findings. First, as the trier of fact, the compensation judge is to resolve conflicting expert testimony. Drs. Barron and Arnold came to opposite conclusions, and the judge found Dr. Arnold's opinion the more persuasive of the two. Second, while there is evidence that Nord was under stress, his job regularly required several consecutive days of work and several consecutive days of being on call. Third, while Nord's job involved exertion, he did a variety of tasks, some requiring little exertion and some requiring much exertion. There is no direct evidence that Nord was exerting heavily on the Sunday he suffered his infarction. Finally, there is a conflict of evidence on the issue of whether Nord worked on Saturday, one day prior to his infarction.

■ There are several reasons, on the other hand, to support the WCCA's conclusion that the compensation judge's findings lacked substantial evidentiary support. While the trier of fact's choice between experts whose testimony conflicts is usually upheld, that choice is not upheld where

the facts assumed by the expert in rendering his opinion are not supported by the evidence. *Klapperich v. Agape Halfway House, Inc.,* 281 N.W.2d 675, 680 (Minn. 1979) (expert relied upon by WCCA assumed worker's mental stress to be very significant; court found that the record did not support this assumption and reversed). Dr. Arnold assumed that Nord suffered intermittent chest pain for 24 hours, that the pain started on his day off (Saturday), and that Nord was under no stress at that time. Nord explained to his doctor, however, that his pain occurred while exerting in the course of his duties, and eased upon rest, only to begin again upon exertion. Both Mrs. Nord and Nord's son testified that Nord worked on Saturday; Nord's son saw Nord's car parked at the hospital in the morning and the afternoon. Nord was considered a conscientious worker and was scheduled to work that day. Against this evidence, the fact that Nord's timecard was not filled in for Saturday is not of substantial weight.

Finally, the evidence supports the proposition that Nord's job required exertion and that Nord was under greater than usual stress in his employment. While Nord often worked and was on call for several consecutive days, he rarely worked them without overlapping help from Mueller, his coworker. Nord was not a complainer, but did tell his wife the week before his death that the job was getting to him. He also came home tired that week, and was tired after work on Saturday, the day before he suffered an infarction. Nord's typical work on Sunday, shoveling out the incinerator and cleaning the boilerroom, did involve physical exertion.

■ Upon a review of the evidence as a whole, we cannot conclude that the WCCA was clearly and manifestly in error in determining that the compensation judge's findings lacked substantial evidentiary support. Furthermore, because the WCCA's substituted findings are not manifestly contrary to the evidence, we affirm those findings.

Respondent Nord is awarded $400 attorney fees.

The decision of the Workers' Compensation Court of Appeals is affirmed.