Kelci STRINGER, individually and as Personal Representative of the Estate of Korey Stringer, and as Trustee for the Heirs and Next–of–Kin of Korey Stringer, and Kodie Stringer, a Minor, through his Parent and Natural Guardian, Kelci Stringer, and Cathy Reed–Stringer and James Stringer, Appellants,

v.

MINNESOTA VIKINGS FOOTBALL CLUB, LLC, and Fred Zamberletti and Chuck Barta and Paul Osterman, Respondents,

and

Dennis Green and Michael Tice, and W. David Knowles, M.D., and Mankato Clinic, Ltd., and Sheldon Burns, M.D., and David Fischer, M.D., and Orthopaedic Consultants, P.A., and Edina Family Physicians, a professional association, and John Does 6 through 30, Natural Persons or Entities Whose Names or Identities are Unknown to Plaintiff, Defendants.

Nos. A03–1635, A04–205.

Supreme Court of Minnesota.

Nov. 17, 2005.

Stanley Chesley, Paul DeMarco, Waite, Schneider, Bayless & Chesley Co., LPA, Cincinnati, OH, Eric J. Magnuson, Diane B. Bratvold, Rider Bennett, LLP, Richard

G. Hunegs, Randal W. LeNeave, Hunegs, Stone, LeNeave, Kvas & Thornton, P.A., Minneapolis, MN, Kenneth R. White, Kevin O'Connor Green, P.A., Mankato, MN, for Appellants.

James A. O'Neal, Bruce G. Jones, Amy R. Freestone, Faegre & Benson, LLP, Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

Korey Stringer, a highly respected member of the Minnesota Vikings football team, died of heat stroke after the second day of practice at the 2001 Vikings training camp. Kelci Stringer, Korey Stringer's wife, as trustee and personal representative of the estate of Korey Stringer, brought a wrongful death action against the respondents in Hennepin County District Court.[1] The respondents moved for summary judgment. The court granted respondents' motion and dismissed the action against them. The Minnesota Court of Appeals affirmed. On appeal, we must determine whether Kelci Stringer can show the existence of genuine issues of material fact that Vikings' employees Paul Osterman and Fred Zamberletti are not immune from coemployee liability. To make this determination, we must address the interaction between common law tort liability and the workers' compensation system, which has restricted coemployee liability in negligence actions. As part of our analysis, we must determine whether our prior case law on coemployee immunity is applicable to the facts of this case when determining whether Osterman and Zamberletti owed Korey Stringer a personal duty and, if there was a duty, whether Osterman and Zamberletti were grossly negligent in performing that duty. We conclude that the personal duty test is applicable, but that Osterman and Zamberletti did not owe Korey Stringer a personal duty. Therefore, the district court did not err when it granted summary judgment. We affirm, but on grounds different from those articulated by the court of appeals.

On August 1, 2001, Korey Stringer, 27, a Pro Bowl offensive tackle for the Minnesota Vikings, died of complications from heat stroke. Stringer collapsed after the morning practice on the second day of training camp in Mankato, Minnesota. His core body temperature, when first measured at Immanuel St. Joseph's Hospital in Mankato, was 108.8 degrees F.

*First Day of 2001 Training Camp*

Stringer reported to the Vikings training camp on Sunday, July 29, 2001. At a team meeting that evening, head athletic trainer Charles Barta[2] briefly spoke to the team members about heat and making sure they drank plenty of fluids. The

---

1. Kelci Stringer brought the suit against the Minnesota Vikings, several Vikings employees, and several Vikings physicians. The district court dismissed the counts against most of the defendants. In this appeal, only the Minnesota Vikings Football Club, LLC; Fred Zamberletti, coordinator of medical services; Charles (Chuck) Barta, head athletic trainer; and Paul Osterman, assistant athletic trainer, remain as respondents and, of these, Kelci Stringer states that she now presents only one claim of gross negligence against Zamberletti and Osterman.

2. Following briefing, but before the scheduling of oral argument, respondent Chuck Barta submitted a motion requesting his dismissal from this appeal on the ground that Stringer had raised no issue as to Barta that could possibly result in reversal of the court of appeals' decision affirming summary judgment in Barta's favor. Stringer opposed the motion and we deferred action on the motion until this case was resolved. In light of the decision reached in this case, we deny Barta's motion on the ground that it is now moot.

players did not receive any written instructions about guarding against heat-related illnesses.

The chain of events leading to Korey Stringer's death appears to start on the first day of practice, July 30, 2001. July 30 was a day of high heat and humidity with a heat index of at least 109 during the afternoon practice. On that first day, there was a morning and an afternoon practice where the players did not wear their full gear. Before the morning practice, Stringer told Barta that he had an upset stomach. Barta listened to Stringer's self-diagnosis that he was "jumpy" and gave him some Tums, an antacid. Before the afternoon practice, Barta gave Stringer some Gatorade with an electrolyte supplement because Barta knew that Stringer had suffered from "heat-related problems" in previous training camps. As the result of heat-related illness, Stringer had received fluids intravenously at least once at a previous training camp.

About 45 minutes into the afternoon practice, Stringer vomited twice. Vikings offensive line coach Mike Tice told Stringer to leave the practice and called Barta over to look at Stringer. Barta again listened to Stringer's self-diagnosis that he was feeling anxious and brought him to the on-field trailer after Stringer vomited a third time. Barta stated in his deposition that he told Stringer to consume some liquids, but he did not monitor whether Stringer drank anything.

Already inside the trailer were Fred Zamberletti, coordinator of medical services for the Vikings; Paul Osterman, an assistant trainer[3]; and another Vikings team member. Barta told Zamberletti that Stringer had been vomiting and that he brought him to the trailer to "cool down" and "take it easy." Barta then left the trailer to go back to the practice. Zamberletti stated that he observed Stringer and did not believe that he was in a lot of distress because he was sitting upright at the edge of the examination table. Dr. W. David Knowles, a Mankato physician who provided medical services for the Vikings, arrived soon after and examined the other Vikings team member, but he did not examine Stringer. Osterman, Zamberletti, and Barta all testified that Stringer was frustrated that he was taken out of the Monday afternoon practice.

Stringer left the trailer that afternoon without anyone examining him. Dr. Knowles' report for July 30 stated that Stringer "had an episode of heat exhaustion during afternoon training camp. He recovered without incident following rest and hydration." Athletic intern D.J. Kearney said Barta instructed him to bring some Gatorade to Stringer's dormitory room that evening. The following morning, July 31, Barta asked Stringer how he felt and checked Stringer's weight on the weight chart[4]. Barta said that Stringer

3. At the time of Korey Stringer's death, Osterman was not certified or registered as an athletic trainer although he had completed a 4-year degree program, testing, and other requirements for certification and registration. Paul Osterman was certified as an athletic trainer on August 31, 2001, and registered with the Minnesota Board of Medical Practice as of January 12, 2002.

4. Team members were instructed to weigh themselves in the morning before practice and in the afternoon after practice. No monitoring was done to ensure that they weighed themselves as requested or that they weighed themselves out of their uniforms. Stringer's weight chart showed that his weights during the camp were as follows: July 30 a.m.—336 pounds; July 30 p.m.—330 pounds; July 31 a.m.—332 pounds. Barta said that he considered Stringer's two-pound weight gain overnight to be acceptable for Stringer to practice.

replied that he had an upset stomach, but that he felt okay. No other monitoring of Stringer was done.[5]

*Second Day of Practice*

July 31, the second day of practice, was also a day of high heat and humidity. The morning practice began at approximately 8:45 a.m. with the players wearing full gear. The heat index was already almost 90 when the morning practice began.[6] Sometime during the morning practice, Stringer vomited again, but he continued to participate in the practice. A photographer noticed that Stringer appeared to be struggling during the practice and was drenched with sweat.[7] At about 10:30 a.m., Stringer turned an ankle, which Barta taped. Stringer then returned to practice. Witness testimony indicates that during practice, Stringer either fell to his knees or to the ground more than once, getting up by himself each time.

Shortly after the main morning practice ended at approximately 11:15 a.m., Stringer dropped to his knees, fell to his right side, and then threw his hands over his head and lay on his back. Osterman and Kearney heard another Vikings player call "Trainer." Osterman was the only athletic trainer remaining on the field at that time. Barta had given Osterman a cell phone and told him to call Zamberletti "if anything comes up." Barta also gave Osterman a list of phone numbers, which included Dr. Knowles' number and an ambulance service.

In his deposition, Osterman initially stated that he "saw Korey getting up from the ground after kneeling on one knee." Osterman later stated that Stringer was lying flat on his back when he first arrived and that he did not know how long Stringer had been lying there. Kearney also confirmed that he had initially seen Stringer lying flat on his back. The photographer, who had previously observed Stringer, also saw Stringer lying on the football field and estimated that he was lying there for about five minutes. Although two other witnesses said that Stringer had been moaning or groaning for several minutes, Osterman said that he had not heard him. Osterman testified that he asked Stringer how he was doing, but Stringer ignored him, and again got up without any assistance. Stringer went to the "big bag," hit it one time, and then headed toward the trailer. Stringer was sweating, but Osterman did not remember any details about what Stringer was wearing or how sweaty he was.

*Inside the Trailer*

Osterman said that even though he thought Stringer was "doing fine," he brought Stringer to the air-conditioned trailer as a "preventive" measure. Osterman testified that Stringer "jogged" to the trailer, but a Vikings teammate stated that Stringer only jogged a couple of steps and then walked to the trailer. According to Osterman, about five minutes passed between the time he saw Stringer lying on

---

**5.** The Minnesota Department of Labor and Industry (MDLI) inspected the Mankato training facility and the Vikings' safety provisions that were in place on July 30 and 31, 2001. The MDLI concluded that "no provisions of the Minnesota Occupational Safety and Health Act or its standards were violated by the Vikings during July 30 and 31, 2001." The MDLI did nevertheless make some recommendations to the Vikings "for reducing and monitoring the effects of heat and humidity on players."

**6.** Respondents acknowledge that a total of 11 Vikings players were treated for heat-related illnesses on July 31, 2001.

**7.** Included in the record are articles written about heat stroke. According to one article, heat exhaustion is associated with heavy sweating. Another article, written by one of the respondents' experts, states that vomiting can be an early warning sign of impending heat stroke.

the ground and the time they entered the trailer. Estimates are that Stringer and Osterman entered the trailer at about 11:20 a.m.

Osterman's testimony was that when Stringer was inside the trailer, he "jumped up" on one of the tables. Osterman said he asked Stringer how he was. It appears from the record that Stringer did not respond to Osterman's question. About five minutes later, Kearney also entered the trailer with some water for Stringer even though, according to Barta, Gatorade and ice bags were already inside the trailer. Kearney left soon thereafter. No one else was in the trailer. Stringer drank "one or two sips" of the water. Osterman said that he determined that Stringer's skin was "cool and moist"[8] and he then "just kind of let him relax" for between five and ten minutes.

After this time had passed, Stringer got off the table and moved to the floor. He asked Osterman to remove his shoes and socks and cut the tape from his ankles. Osterman did so and said that Stringer thanked him, but Osterman did not recall Stringer saying anything else the rest of the time while in the trailer and he did not ask Stringer any other questions. Osterman also said that Stringer drank some more sips of water, but he did not know how much. A bit later, Stringer moved back to the table and began humming and "bopping his head back and forth." He continued this behavior for another ten minutes or more.

Osterman then called the athletic training room to have someone come with a golf cart to pick up Stringer. Osterman said that he waited to call the training room because "they're pretty busy after practice and, * * .* there really wouldn't have been anyone around to come out before that" and because he did not think this was an emergency. Stringer got off the table and lay down on the floor again. Osterman applied at least one ice towel to Stringer's forehead, but Stringer pushed it away and Osterman did not reapply it. The golf cart came about five to ten minutes after Osterman placed the call to the training room.

When the golf cart arrived, Osterman and Kearney tried to get Stringer up, but he was unresponsive. Osterman testified that he instructed Kearney to get him some ice towels and to get Zamberletti. Kearney stated that he "knew there was something not right about the situation" because Stringer was not responding and appeared to be having difficulty moving. Kearney and Osterman rolled Stringer on to his side. Osterman said, "I was kind of confused because that was the first sign that something was going wrong." Osterman also said that this was the first time he checked any of Stringer's vital signs, such as his pulse. Osterman said Stringer's breathing was "normal"; his pulse was steady but slow, but he did not count the beats per minute. He did not have a thermometer and did not think to check Stringer's temperature. He also did not take Stringer's blood pressure. He applied two ice towels to Stringer. Neither Osterman nor Kearney called an ambulance up to this point.

---

**8.** According to Osterman, it was important that Korey Stringer's skin was cool and moist because from his training he learned that a person who was suffering from heat stroke would have hot and dry skin. We note from information in the record, however, that chills and moist skin can be a symptom of heat exhaustion. Dizziness, weakness, and vomit-ing can also be warning signs of impending heat stroke. Moreover, while hot and dry skin can be a symptom of heat stroke, it is not the only symptom. Other symptoms can include fever, confusion, rapid and shallow breathing, an abnormally fast heart rate, vomiting, seizures, and unconsciousness.

Zamberletti arrived with Kearney after about three to five minutes. According to Osterman, Stringer's breathing became shallower and quicker as Zamberletti arrived. Kearney also stated that Stringer's breathing had changed since the time he left to get Zamberletti. Stringer was also groaning, which, to Kearney, sounded involuntary. Osterman did not say anything to Zamberletti and testified that as soon as he entered the trailer, Zamberletti said, "[Stringer's] hyperventilating." Zamberletti did not ask for any history about Stringer's condition, but he instructed Kearney to put a Ziploc bag over Stringer's mouth because of his belief that Stringer was hyperventilating. Kearney stated that he held the bag over Stringer's mouth and nose for about one to one and one-half minutes. Kearney also stated that he did not believe Stringer's breathing improved as a result of using the bag. After trying the Ziploc bag treatment, Zamberletti took Stringer's pulse and testified that it "was real rapid," but he did not count the beats per minute.

Zamberletti testified that he then instructed Osterman to leave the trailer and to call for a van. Osterman did so and when he came back inside the trailer, Zamberletti told him to call Dr. Knowles.[9] Osterman was unable to reach Knowles so he called his nurse, who said that she would page Knowles. Knowles called back about three or four minutes later and Zamberletti left the trailer to speak with him. According to Zamberletti, after his conversation with Knowles, Zamberletti instructed Osterman to call Gold Cross ambulance.[10]

During this time, Kearney, on his own, replaced one ice towel that was behind Stringer's neck and another on his chest. Kearney also monitored Stringer's airway to make sure he was breathing and heard "a lot of fluid or saliva." He said that Stringer's skin was "cool and moist." Zamberletti also testified that when he returned to the trailer, he monitored Stringer's airway, breathing, and circulation. Zamberletti testified that at that time he did not think Stringer's condition was heat-related. Instead, he said, "I thought there was a possibility [Stringer] could have just fainted. I thought that he could have had the possibility of a seizure, which would have—could have been done by an insect bite or some medication that he had taken or something."

### Hospitalization and Death

The ambulance was dispatched at 12:00 noon and arrived at the football field at 12:08 p.m. The paramedics put Stringer on a backboard and briefly examined him. Zamberletti said that the paramedics did not ask him any questions. Zamberletti rode in the ambulance with Stringer to the hospital. Zamberletti observed the paramedics taking Stringer's blood pressure and pulse and he assisted them with suctioning saliva from Stringer's mouth. Neither Zamberletti nor the paramedics took any action to cool Stringer when he was in

9. Osterman's testimony differs from Zamberletti's on the timing of the phone calls and Osterman's leaving the trailer. According to Zamberletti, Osterman was inside the trailer during the treatment with the Ziploc bag. Zamberletti also testified that he told Osterman to call for the van before he told him to call Knowles. Osterman, however, testified that Zamberletti told him to leave in order to call Knowles before Kearney performed the Ziploc bag treatment.

10. Osterman's and Zamberletti's testimony differs on which of them had the idea for Osterman to call an ambulance. Osterman said that he first thought to call an ambulance before Knowles called back, but Zamberletti stated that he told Osterman to call an ambulance after Zamberletti returned to the trailer after speaking with Knowles.

the ambulance. Shortly before reaching the hospital, Stringer began vomiting a large amount of clear fluid. The ambulance arrived at Immanuel St. Joseph's Hospital at 12:24 p.m.

On admission, Stringer was unconscious, his pulse was 148 beats per minute, and his blood pressure could not be determined. When hospital personnel took Stringer's temperature at 12:35 p.m., the reading was 108.8 degrees F. The hospital packed bags of ice around Stringer, inserted intravenous lines for rapid infusion of saline, and attempted other methods to assist in cooling. As Stringer's condition continued to worsen, hospital personnel attempted infusions of plasma, dialysis, and drug treatments. CPR was started at about 1:20 a.m. on August 1, but was finally discontinued after about 30 minutes. Korey Stringer died from heat stroke at 1:50 a.m. on August 1, 2001.

*Cause of Action*

Kelci Stringer, Korey Stringer's wife and personal representative of his estate, filed a wrongful death action in Hennepin County District Court asserting 13 separate counts. Count I included Osterman and Zamberletti and asserted they each had a personal duty to protect and care for Korey Stringer's health and that they were grossly negligent in carrying out their personal duty. The court determined that Osterman and Zamberletti did not owe Korey Stringer a personal duty and that they were not grossly negligent and granted Osterman's and Zamberletti's motion for summary judgment, dismissing the counts against them.

Kelci Stringer appealed. The court of appeals affirmed, holding that although Osterman and Zamberletti owed Korey Stringer a personal duty, their actions

were not grossly negligent as a matter of law. *Stringer v. Minnesota Vikings Football Club, LLC,* 686 N.W.2d 545, 551–52 (Minn.App.2004). The court determined that Osterman and Zamberletti owed Korey Stringer a personal duty because they were both directly engaged in Stringer's care and treatment and their actions did not involve general workplace safety. *Id.* at 550–51. The court analogized the situation to circumstances when an ordinary person takes charge of or controls circumstances, thereby creating an affirmative duty to provide care. *Id.* at 551.[11]

Though finding a personal duty, the court of appeals did not conclude that Osterman's or Zamberletti's actions were grossly negligent because the two men had taken some actions to care for Stringer. *Id.* at 552. The court said, "[r]espondents' actions may reflect poor judgment or lack of reasonable care, but there is no basis to conclude that respondents disregarded the risk to Stringer altogether in a manner 'equivalent to a willful and intentional wrong.'" *Id.*

Kelci Stringer petitioned for review on the issue of whether Osterman and Zamberletti were grossly negligent. Osterman and Zamberletti sought cross-review of the issue of whether they owed Korey Stringer a personal duty. We granted both requests for review.

I.

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Odenthal v. Minn. Conf. of Seventh–Day Adventists,* 649 N.W.2d 426, 429 (Minn.

---

**11.** The court of appeals also held that Barta did not owe Korey Stringer a personal duty based on the court's conclusion that Barta's actions "arose out of his employer's nondelegable duty to ensure safe work conditions." 686 N.W.2d at 551.

2002); Minn. R. Civ. P. 56.03. We review de novo whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *Meintsma v. Loram Maint. of Way, Inc.*, 684 N.W.2d 434, 438 (Minn.2004). We do not weigh facts or determine the credibility of affidavits and other evidence. *DLH, Inc. v. Russ*, 566 N.W.2d 60, 70 (Minn.1997). The nonmoving party must do more than rest on averments or denials of the adverse party's pleading. Minn. R. Civ. P. 56.05; *see also DLH, Inc.*, 566 N.W.2d at 71. The moving party has the burden to show the absence of an issue of material fact. *Brookfield Trade Ctr., Inc. v. County of Ramsey*, 609 N.W.2d 868, 874 (Minn.2000).

*Workers' Compensation Background*

 To provide the necessary context to our analysis, we begin with a brief summary of Minnesota's workers' compensation system. This system is based on a compromise between employees and employers and involves "a mutual renunciation of common law rights and defenses by employers and employees alike." Minn. Stat. § 176.001 (2004); *see also Foley v. Honeywell, Inc.*, 488 N.W.2d 268, 271 (Minn.1992). Under the workers' compensation statutory scheme, the employer "is liable to pay compensation in every case of personal injury or death of an employee arising out of and in the course of employment without regard to the question of negligence." Minn.Stat. § 176.021, subd. 1 (2004). The employer's liability to pay compensation "is exclusive and in the place of any other liability." Minn.Stat. § 176.031 (2004). Under this scheme, an employee is precluded from bringing a tort action for damages against the employer.[12]

██ But an injured employee or the employee's personal representative may, under certain limited circumstances, bring an action in tort against a coemployee for the latter's gross negligence. *Wicken v. Morris*, 527 N.W.2d 95, 98 (Minn.1995). Minnesota Statutes § 176.061, subd. 5(c) (2004), specifically provides:

> A coemployee working for the same employer is not liable for a personal injury incurred by another employee unless the injury resulted from the gross negligence of the coemployee or was intentionally inflicted by the coemployee.

The term "coemployee" includes a "corporate officer, general supervisor, or foreman." *Dawley v. Thisius*, 304 Minn. 453, 455, 231 N.W.2d 555, 557 (1975). In *Wicken*, we stated that, to establish a gross negligence claim against a coemployee, the injured employee must show:

1. the coemployee had a personal duty toward the employee, the breach of which resulted in the employee's injury, and that the activity causing the injury was not part of the coemployee's general administrative responsibilities; and

2. the injury arose from gross negligence on the part of the coemployee.

*Wicken*, 527 N.W.2d at 98.

The first prong of the test we adopted in *Wicken* was first articulated in *Dawley*, a 1975 case that involved a wrongful death action against a company's general manager. 304 Minn. at 455, 231 N.W.2d at 557. The second prong of the test is based on a 1979 amendment to the workers' compensation statute. The 1979 amendment added language to Minn.Stat. § 176.061, subd. 5(c), and bars coemployee liability except where the coemployee has been grossly

---

**12.** There is one exception to an employer's immunity from tort actions under workers' compensation, which allows the employee to sue his or her employer if the employer has willfully assaulted and injured the employee (the "intentional injury exception"). *Gunderson v. Harrington*, 632 N.W.2d 695, 702–03 (Minn.2001).

negligent or has committed an intentional tort. Act of June 7, 1979, ch. 3, § 31, 1979 Minn. Laws 1256, 1272. Before the 1979 amendment, the Workers' Compensation Act did not specifically include a provision for coemployee immunity. *See* Minn.Stat. § 176.061 (1978). In enacting coemployee immunity in 1979, the legislature adopted the rationale of the Minnesota Workers' Compensation Study Commission, which was concerned that allowing an employee to sue a coemployee for simple negligence "tends to shift tort liability from employer to fellow employee in a manner never intended by the workers' compensation system." Jay Y. BenAnav, *Workers' Compensation Amendments of the 1979 Minnesota Legislature*, 6 Wm. Mitchell L.Rev. 743, 764 (1980) (quoting Minnesota Workers' Compensation Study Commission, *A Report to the Minnesota Legislature and Governor*, 41 (1979)). As the Study Commission language demonstrates, the purpose of the 1979 amendment was to allow only a narrow window for coemployee liability.[13]

*Personal Duty Requirement*

■ With the foregoing background, the next step in our analysis is to determine whether the district court erred when it granted summary judgment for the respondents on the issue of whether the respondents owed Korey Stringer a personal duty. The presence of a duty is a

question of law that we review de novo. *Wong v. American Fam. Mut. Ins. Co.*, 576 N.W.2d 742, 745 (Minn.1998).

In *Dawley*, we adopted the requirement of a personal duty to overcome coemployee immunity in the context of a wrongful death action against the company's general manager. Dawley was a worker at a sheet metal company who died after he fell into a tank filled with a caustic detergent solution. 304 Minn. at 454, 231 N.W.2d at 556. The plaintiff in *Dawley*, the deceased worker's estate, sued the company's general manager asserting that the manager had "general overall responsibility for the day-to-day operation" of the company. *Id.* at 454, 231 N.W.2d at 556–57. We determined that the plaintiff's allegation that the supervisor had a general duty to provide a safe place to work was insufficient to show that the supervisor owed a personal duty to the deceased worker. *Id.* at 456, 231 N.W.2d at 558. We then stated that a coemployee will have no personal liability "because of his general administrative responsibility for some function of his employment without more." *Id.* at 456, 231 N.W.2d at 557.

■ A critical concept underlying our holding in *Dawley* was the preservation of the compromise struck in the workers' compensation statute balancing certain, but limited, benefits provided to employees injured in the course of their employment

---

13. An employer who pays workers' compensation benefits to an employee injured by a third party's negligence, including the gross negligence of coemployee tortfeasor, is ordinarily entitled to bring a subrogation action against the third party and seek reimbursement for those payments. Minn.Stat. § 176.061, subd 5(a) (2004). The employer may join in a tort action brought by the employee or may bring a separate action. *Id.* "To the extent that coemployees are liable on the same basis as any other third persons, it follows logically that the employer can exercise subrogation rights against its own tortfeasor employee." 6 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 111.02, at 111–4 (2003). Workers' compensation was intended to keep the burden of loss on industry as a cost of production rather than on employees. *Arens v. Hanecy*, 269 N.W.2d 924, 926 (Minn.1978) (citing *Eichholz v. Shaft*, 166 Minn. 339, 342, 208 N.W. 18, 19 (1926)). But allowing the employer subrogation rights against the coemployee tortfeasor has the tendency to shift that burden to the coemployee. To minimize this burden shifting, the window of coemployee liability should be narrow. Subrogation rights are not at issue in the case before us.

with the limitations on the ability of workers to recover damages in tort actions. *See id.* at 455–56, 231 N.W.2d at 557. We explained that the duty to provide employees with a safe workplace is a nondelegable duty held by the employer. *Id.* at 456, 231 N.W.2d at 558. Therefore, we concluded that the manager was immune from being sued personally for failing to provide a safe workplace because providing a safe workplace was the employer's duty and the workers' compensation statute precludes an action against the employer for an alleged breach of its duty. *Id.* at 456, 231 N.W.2d at 558. In other words, when the alleged breach of duty falls within the workers' compensation compromise between employers and employees, the coemployee should not be held liable. To create personal liability for the coemployee, we require that "[t]he acts of negligence for which a co-employee may be held liable must be acts constituting direct negligence toward the plaintiff, tortious acts in which he participated, or which he specifically directed others to do." *Id.* at 456, 231 N.W.2d at 557.

In *Wicken,* we applied *Dawley* and required that for a coemployee to be liable for his or her acts of negligence to a coemployee, he or she must breach a duty based on personal fault, which is something different from the coemployee's "general administrative responsibility for some function of his employment." *Wicken,* 527 N.W.2d at 98. Like *Dawley, Wicken* also involved an action against a company manager for acts that had not been directed at any specific employee. We concluded that a manager, who made false statements in applying for a DNR permit in order to burn explosive material, did not owe a personal duty to the workers who were killed by a resulting explosion. We said that the permit application did not create a personal duty because it was not directed toward the injured employees, but "was an administrative activity required as an integral part of [the coemployee manager's] employment obligations." *Id.* at 99. We also stated, "[t]o hold otherwise, permitting co-employee liability when harm results however indirectly from the carrying out of administrative obligations incident to work responsibilities would eviscerate the fundamental purpose of the workers' compensation laws." *Id.*

The *Dawley* and *Wicken* holdings are a bit difficult to apply to the facts before us because the two earlier cases do not address the situation where the coemployee's responsibilities involve direct contact with a coemployee, as is the situation here. In both *Dawley* and *Wicken,* the defendants held managerial positions and their acts had broad impact within the company. Because the facts of *Dawley* and *Wicken* involved duties not directed toward a specific person, we did not discuss whether "general administrative responsibility" meant only duties of general impact on all employees or whether it also includes carrying out work duties, regardless of whether the work duties involve direct contact with a coemployee, as the respondents contend. Nor did we discuss specifically whether the personal duty requirement applied only to managers, supervisors, or officers. Here, the parties do not dispute that coemployees—Osterman and Zamberletti—took direct action toward Korey Stringer; but they disagree on whether the coemployees' direct action was sufficient to create a personal duty.

Kelci Stringer contends that Osterman's and Zamberletti's direct actions toward Korey Stringer created a personal duty owed to him. She argues that *Dawley* and *Wicken* distinguish between "actions taken by an employee that have broad and general impact on all fellow employees" (general administrative responsibilities) and "direct, personal actions that a particular employee takes with respect to a particular co-employee." According to Kelci String-

er, the latter are personal duties and the former are not. In this case, Kelci Stringer asserts that general administrative responsibilities would have included procuring enough fluids for the team, staying abreast of weather forecasts, or making sure that trainers and interns had the proper equipment.

The respondents argue that an administrative responsibility is any task performed in the scope of one's employment and that performance of such a task cannot create a personal duty. They assert that administrative responsibilities are those duties carried out by employees—and Osterman and Zamberletti were only carrying out their required work duties when they attempted to help Korey Stringer. Respondents assert that Kelci Stringer's argument that direct contact with the injured employee creates a personal duty would serve to protect those who devise policy, but would leave defenseless those who carry it out. They further claim that the standard of personal duty asserted by Kelci Stringer would thwart the goals of the workers' compensation system and significantly expand coemployee liability. They contend that a personal duty arises only when the coemployee departs from his or her employment responsibilities and voluntarily assumes additional duties that put another employee at risk.

We conclude that neither Kelci Stringer nor the respondents have articulated the correct test for overcoming coemployee immunity. Rather, each has articulated only a portion of the test. Our holdings in *Dawley* and *Wicken* are clear that direct action toward the injured employee is required before a personal duty is created. *Dawley*, 304 Minn. at 456, 231 N.W.2d at 557 ("[t]he acts of negligence for which a co-employee may be held liable must be acts constituting direct negligence toward the plaintiff, tortious acts in which he participated, or which he specifically directed others to do"); *Wicken*, 527 N.W.2d at 98–99. But direct contact alone is insufficient; the employee whose job involves direct contact with others should not bear inordinate risk for coemployee liability for the simple fact of his chosen employment or assigned duties. Therefore, we also stated "personal liability * * * will not be imposed on a co-employee because of his general administrative responsibility for some function of his employment without more." *Wicken*, 527 N.W.2d at 98.

■ Our holdings in *Dawley* and *Wicken* have in essence created a two-prong test which must be met before a coemployee has undertaken a personal duty to a coemployee. To have a personal duty to the injured employee, the coemployee must have (1) taken direct action toward or have directed another to have taken direct action toward the injured employee, *Dawley*, 304 Minn. at 456, 231 N.W.2d at 557, and (2) acted outside the course and scope of employment, *see Wicken*, 527 N.W.2d at 98. This personal duty applies to all coemployees and we do not distinguish between managers, supervisors, or officers and other coemployees in the requirement of a personal duty. We see no reason to treat them separately.[14] *See*

14. We recognize that the personal duty concept arose in the context of actions against a coemployee supervisor or officer. To incur tort liability, the supervisor or officer had to be acting as a coemployee and not in his or her capacity as a corporate officer or supervisor while acting on behalf of the employer. *See Gerger v. Campbell*, 98 Wis.2d 282, 297 N.W.2d 183, 186 (1980) ("Only if it can be said that by [the officer's or supervisory employee's] conduct he has changed his status from that of a supervisor to that of a co-employee will an action for common law tort lie."). We note that we are not the only jurisdiction to eliminate the distinction between supervisory and managerial employees and other coemployees when determining

*Gunnett v. Girardier Bldg. and Realty Co.*, 70 S.W.3d 632, 638 (Mo.Ct.App.2002).

We did not use the specific phrase "course and scope of employment" in either *Dawley* or *Wicken;* therefore, it is important at this point in our analysis that we elaborate on why we conclude that a personal duty necessarily contemplates that the coemployee must have acted outside of his or her course and scope of employment. In *Wicken,* we said a coemployee does not owe a personal duty based on a "general administrative responsibility for some function of his employment without more." *Wicken,* 527 N.W.2d at 98. We also stated that the DNR permit application in *Wicken* "was an administrative activity required as an integral part of [the manager's] employment obligations." *Id.* at 99. "Scope of employment" is defined as "the field of action in which a servant is authorized to act in the master-servant relationship." Black's Law Dictionary 1374 (8th ed.2004). "Course of employment" refers to "[e]vents that occur or circumstances that exist as a part of one's employment; esp., the time during which an employee furthers an employer's goals through employer-mandated directives." *Id.* at 378. Under the workers' compensation system, we have said that course of employment refers to the time, place, and circumstances of the incident causing the injury. *Gibberd by Gibberd v. Control Data Corp.*, 424 N.W.2d 776, 780 (Minn. 1988).

■ We conclude that, while we did not use the specific phrase, "course and scope of employment" under the facts of either *Dawley or Wicken,* we articulated essentially the same concept when we spoke of the coemployee's "administrative activity required as an integral part of * * * employment obligations" or "administrative obligations incident to work responsibili-

ties," *Wicken,* 527 N.W.2d at 99, and the "general administrative responsibility for some function of * * * employment," *Dawley,* 304 Minn. at 456, 231 N.W.2d at 557. We discussed the specific term "administrative" in *Dawley* and *Wicken* because the facts of both of those cases involved administrative responsibilities of coemployee managers. But our stated concerns in *Wicken* included that the coemployee not be held personally liable for decisions he was required and authorized to make as part of his job and that we "[maintain] the integrity of the compromise between employers and employees" under workers' compensation. *Wicken,* 527 N.W.2d at 99. Thus, the relevant issue is not whether the personal duty requires us to explain the meaning of the term "administrative," but rather whether any articulation of what constitutes a personal duty would upset the purposes of the workers' compensation system to fairly and fully compensate the meritorious injury claim. *See Dawley,* 304 Minn. at 455–56, 231 N.W.2d at 557; *Wicken,* 527 N.W.2d at 99; *see also Franke v. Fabcon, Inc.,* 509 N.W.2d 373, 376 (Minn.1993). Acting within the course and scope of employment is what brings the coemployee within the protection of the workers' compensation system.

We acknowledge the concerns raised by the dissent. We share some of these concerns and have considered them carefully; but we conclude that the dissent's analysis ultimately fails because it does not sufficiently answer the question on personal duty that is before us in light of our case law and the purposes of the workers' compensation scheme. When the dissent asserts that a course and scope of employment test is an incorrect reading of personal duty, it relies significantly on

---

personal duty. *See Gunnett,* 70 S.W.3d at 638 (defining coemployee to include a corporate

officer, a supervisor, as well as a coworker in the context of the coemployee personal duty).

*Behr v. Soth,* 170 Minn. 278, 212 N.W. 461 (1927), a pre–1979 legislative amendment case that does not discuss personal duty. In *Behr,* we held that coemployees are included among third parties for purposes of tort liability under the workers' compensation scheme. *Id.* at 283, 212 N.W. at 463. And we determined that the fire chief defendant was acting within the course and scope of his employment when he drove his personal vehicle to a fire rather than going to the fire in a city-owned vehicle. *Id.* at 281–82, 212 N.W. at 462–63.

The issue in *Behr,* however, was whether the plaintiff, a coemployee/common enterpriser, was precluded from seeking damages from the defendant because he had already elected to receive workers' compensation benefits. *Id.* at 286–87, 212 N.W. at 463. Under the statute then in effect, the plaintiff could either seek compensation from his employer or pursue the coemployee/common enterpriser in tort.

*Id.* at 284, 212 N.W. at 463. The dissent's assertion that *Behr* rejected a course and scope of employment test for personal duty is far too broad a reading for a case that discusses neither personal duty nor whether the defendant could have been liable under the facts of that case. Reliance by the dissent on the tangential analysis in *Behr* cannot overcome the fact that we adopted the concept of a personal duty in a subsequent case, *Dawley,* and then rearticulated that concept in *Wicken,* and those two cases are the cases on which our analysis must be based.[15]

Moreover, when the legislature passed the 1979 amendments to add a gross negligence requirement, it was silent as to *Dawley's* requirement that a coemployee have a personal duty to an injured coemployee to be liable for tort damages. The dissent concedes that the legislature was silent and acknowledges that the personal duty requirement is applicable here. Given that the legislature took no action to

---

**15.** We also note that, in Minnesota, permitting suit against a coemployee/common enterpriser had more to do with the restoration of the employee's common-law action than with holding the coemployee accountable and discouraging neglect of duties. Before 1913, an employee had a common-law tort action against a third party who was not his own employer. But the Workers' Compensation Act, as enacted in 1913, took that action away, providing instead an election of remedies between recovery from the employer or recovery from the third party who was also subject to the Act and limiting damages to the amount fixed by the Act. *O'Malley v. Ulland Bros.,* 549 N.W.2d 889, 893 (Minn.1996). By amendment in 1923, the legislature restored that common law action, in part, by limiting the election of remedies provision to situations in which the employer and third party, also subject to the Act, were engaged in a common enterprise. *Id.;* Act of April 16, 1923, ch. 279, § 1, 1923 Minn. Laws 373, 374–75 (currently codified at Minn.Stat. § 176.061, subds. 1–4).

We have held that the election of remedies provision applies to suits against coemploy-

ees. *Peterson v. Kludt,* 317 N.W.2d 43, 49 (Minn.1982) (holding, in pre–1979 amendment case, that the election of remedies provision applies to suits against coemployees); *Behr v. Soth,* 170 Minn. 278, 286, 212 N.W. 461, 464 (1927) (holding that injured employee could seek compensation from the employer or from coemployee/common enterpriser but not both). It is true that in 1937 the legislature abrogated the rights of employers and employees to elect not to be bound by the Act and mandated insurance coverage for employers. Act of March 12, 1937, ch. 64, 1937 Minn. Laws 109, 111. But the legislature did not alter the basic compromise between employees and employers which contemplated, according to *Behr,* an election of remedies and limited recovery against common enterprisers, including coemployees. Given that the intent of the coemployee immunity provision of 1979 was to limit coemployee liability, it is doubtful that the legislature intended any expansion of that liability by the placement of the immunity provision at the end of the cumulative remedies section, which ordinarily has application when the election of remedies provisions do not apply.

alter the standard we set forth in *Dawley* and rearticulated in *Wicken,* our case law provides that the legislature's silence expressed its concurrence in *Dawley's* and *Wicken's* holdings. *See Robinson v. Lamott,* 289 N.W.2d 60, 63 (Minn.1979); Minn.Stat. § 645.17(4) (2004) (stating that "[w]hen a court of last resort has construed the language of a law, the legislature in subsequent laws on the same subject matter intends the same construction to be placed upon such language").

In our analysis, we are striving to be true to our precedent and to our rules of construction when we apply *Dawley* and *Wicken* to the facts of this case. The dissent's analysis strays from this objective. For example, the dissent asserts that key language in *Dawley* and *Wicken*—that a coemployee is not liable for a "general administrative responsibility for some function of his employment"—is not relevant here; but when it adopts this approach, it overlooks key concerns from these two cases that a coemployee not be held personally liable for required and authorized decisions and that we maintain the workers' compensation compromise. *See Wicken,* 527 N.W.2d at 99. Finally, the dissent's test, which only requires a direct act toward the injured employee for coemployee liability, fails because it would serve to protect coemployee managers with duties of general impact on a company while increasing the vulnerability of employees whose duties include direct contact with their coemployees.

We conclude that adopting a course and scope of employment prong is compatible with the purposes of the workers' compensation system. *See* Minn.Stat. §§ 176.001; 176.021, subd. 1; *see also Franke,* 509 N.W.2d at 376 (stating that "[w]orkers' compensation * * * is social legislation, providing a measure of security to workers injured on the job, with the burden of that expense considered a proportionate part of the expense of production."). While other jurisdictions have not framed coemployee immunity in terms of a personal duty, we conclude that requiring a showing that the coemployee has acted outside of the course and scope of employment before liability will be imposed is the better approach. Moreover, our approach aligns with holdings on coemployee immunity from certain other jurisdictions that have specifically addressed this issue. *See, e.g., Meade v. Ries,* 642 N.W.2d 237 (Iowa 2002); *Brooks v. Carter,* 102 Ill.App.3d 635, 58 Ill.Dec. 534, 430 N.E.2d 566 (1981); *Jackson v. Hutchinson,* 453 S.W.2d 269 (Ky.Ct.App. 1970); *Daus v. Marble,* 270 N.J.Super. 241, 636 A.2d 1091 (App.Div.1994).

When determining coemployee immunity, we conclude that course and scope of employment should have the same meaning as the course and scope of employment test used to determine whether an employee qualifies for workers' compensation benefits. We note that applying the same test to both the determination of qualification for benefits and coemployee immunity allows for greater uniformity in the application of the workers' compensation statute. Larson refers to using the workers' compensation benefit test as "more satisfactory" than using the scope of employment test used to determine vicarious liability under respondeat superior. 6 Arthur Larson and Lex K. Larson, *Larson's Workers' Compensation Law,* § 111.03(3), at 111–15 (2003).

*Did Osterman and Zamberletti owe Korey Stringer a Personal Duty?*

██ We must now apply the two-prong personal duty test to determine whether Osterman and Zamberletti (1) took direct action toward or directed another to take direct action toward Stringer and (2) acted outside the course and scope of their employment. Application of this test will enable us to determine whether summary

judgment on the personal duty allegation in Count I of the complaint was appropriate. There is no dispute that the first prong of the personal duty test has been met; the parties do not disagree that Osterman and Zamberletti both took direct action toward Stringer. Thus, the focus of our analysis is on the second prong of the test.

Under the second prong of the test, Osterman and Zamberletti must have been acting within their authorized course and scope of employment to not owe a personal duty to Korey Stringer. When an employee engages in acts exceeding his authorization, including the violation of an instruction or a rule, he is acting outside the course and scope of his employment. *Bartley v. C–H Riding Stables, Inc.*, 296 Minn. 115, 117, 206 N.W.2d 660, 662 (1973) (denying workers' compensation benefits to employee thrown from a horse he was instructed not to ride); *see also Lange v. Mpls.-St. Paul Metro. Airports Comm'n*, 257 Minn. 54, 57, 99 N.W.2d 915, 918 (1959). In *Lange*, we distinguished between the performance of authorized acts in a prohibited manner and the performance of prohibited acts. *Id.* at 57, 99 N.W.2d at 918. We explained that the performance of prohibited acts is outside the scope of employment and does not come within the protection of the statute. *Id.* at 57, 99 N.W.2d at 918.

We have held that an activity not explicitly within the employee's defined duties can nevertheless be related to the employee's duties if the work is in "fur-therance of the employer's business." *Ramczik v. Winona Mach. & Foundry Co.*, 174 Minn. 156, 158, 218 N.W. 545, 545 (1928).[16] An employer may also extend the scope of employment by directing or requesting an employee to perform some act outside the usual scope of employment. *Weidenbach v. Miller*, 237 Minn. 278, 292, 55 N.W.2d 289, 296 (1952). The rule that a person's scope and course of employment can be extended also may apply to rescue activities, where the scope and course of an employee's employment may be impliedly extended in an emergency to include the performance of any act designed to save life or property in which the employer has an interest. 2 Larson, § 28.01(1), at 28–2; *Carey v. Stadther*, 300 Minn. 88, 95–96, 219 N.W.2d 76, 80 (1974) (reversing a denial of benefits to a widow of a sales employee who died attempting a rescue where the employer had actively encouraged its employees to perform acts of community service in order to enhance sales). But not every act which might benefit the employer is in the course and scope of employment. 2 Larson, § 27.01(3), at 27–6. And not every rescue is in the course and scope of employment. *Weidenbach*, 237 Minn. at 279–81, 293, 55 N.W.2d at 289–90, 297 (upholding a denial of benefits to dependents of a deceased worker who attempted to rescue a person who had fallen through the ice because there was no express direction by his employer to help the person in peril).

In this case, Osterman and Zamberletti were employed by the Vikings to provide

16. In *Ramczik*, we concluded that a worker who was employed to unload scrap iron from train cars was entitled to workers' compensation benefits when he was injured while helping his coworkers lift a heavy object in the company's foundry. *Ramczik*, 174 Minn. at 157–58, 218 N.W. at 545. Although the injured worker would not have been required to help with lifting in the foundry, we concluded that his attempt to help was incidental to and arising out of his employment because he was still on the employer's premises and the work was in furtherance of the employer's business. *Id.* at 158, 218 N.W. at 545. We note that the additional work the injured worker undertook outside the specific scope of his employment was the same type of work for which he was employed, but in a different location in the company.

some level of care for the Vikings' players and the record demonstrates that their actions toward Stringer occurred within work-related limits of time and place. Further, while we would prefer that the record contain more specific information regarding Osterman's and Zamberletti's duties and responsibilities,[17] we conclude that the record does contain sufficient information to enable us to determine their specific duties with coinciding expectations, responsibilities, and authorization. Thus, on the record before us, we are able to determine whether Osterman and Zamberletti acted within the course and scope of their employment and whether their actions were in furtherance of the interests of the Vikings' organization.

The record provides information about Osterman's degree program to become an athletic trainer, including training he received on recognizing the signs and symptoms of heat emergencies. The job description for Zamberletti as Coordinator of Sports Medicine includes the following as Zamberletti's job duties for the period from January 1999 through January 15, 2002: on-field rehabilitation of players classified physically unable to play and conditioning of developmental and injured reserved players. The record indicates that Zamberletti has been certified as an athletic trainer since 1970 and has been employed with the Vikings since 1961. We also note that the Vikings' Athletic Training Intern Handbook states, "Realize your limitations—never make an assessment. All assessments on players will be done by Chuck [Barta], Fred [Zamberletti], or Dr. Fischer."

Here, Osterman's and Zamberletti's obligations to Stringer directly resulted from their employment by the Vikings and the Vikings' efforts to provide a safe workplace for their players. The record shows that the purpose for employing trainers was to protect the health and safety of the players. The Vikings required at least one trainer to remain on the field until the last player finished with practice. While on the field, the trainers' duties included monitoring practice, providing players with water, and evaluating and treating player injuries. Osterman's and Zamberletti's actions with respect to Stringer conformed with these duties. Osterman testified that while he thought Stringer was "doing fine," he did take Stringer to the air-conditioned trailer as a "preventive" measure. While in retrospect we may want or expect that Osterman and Zamberletti would have responded to Stringer's condition differently, they nonetheless were acting within their scope of employment, and any duty they had toward Stringer did not exist absent their employment status.

We recognize that any time medical attention or care is involved, a great deal of trust is placed in the discretion of the caregiver. Caregivers must not exceed the level of care they are trained and authorized to provide. Those who provide health care services must realize their limitations and those who provide health care services must not make decisions or take actions they are not qualified to make. But we also want those who provide health care services to be able to perform their duties and respond to emergencies without unduly worrying about being subject to personal liability for their acts. We also acknowledge that in this context the course and scope of employment may be difficult to ascertain, especially when em-

**17.** We acknowledge that the record provides a limited description of Osterman's and Zamberletti's specific duties and responsibilities and what the Vikings' organization expected of them, especially what the Vikings expected of Osterman as a new athletic trainer and of Zamberletti as the coordinator of medical service. In the future, we prefer that the record be more fully developed on such issues.

ployees such as Osterman and Zamberletti have the authority to exercise discretion in making assessments. In such situations, an appropriate baseline of job duties, expectations, and authorizations is necessary for a court to determine if an employee exceeded the course and scope of his employment. We conclude that such a baseline exists in the record before us. Accordingly, based on all of the foregoing, we conclude that summary judgment on the issue of whether Osterman and Zamberletti had a personal duty to Korey Stringer was appropriate and therefore we hold that the district court did not err when it granted summary judgment for the respondents.

## II.

Having decided that the district court properly granted summary judgment for the respondents under the personal duty requirement, we need not address whether the district court properly granted summary judgment for the respondents based on gross negligence; therefore, we decline to address this issue.

Affirmed.

PAGE, J., took no part in the consideration or decision of this case.

HANSON, Justice (dissenting).

I respectfully dissent. First, I disagree with the conclusion of the majority on the "personal duty" prong of *Wicken v. Morris*, 527 N.W.2d 95, 98 (Minn.1995). I would conclude that the evidence establishes as a matter of law that Paul Osterman and Fred Zamberletti owed a personal duty to Korey Stringer. As foundation for that conclusion, I would hold that, under our precedent interpreting Minnesota's law of "personal duty" and absent directions to the contrary from the legislature, the plaintiff need not prove that the coemployee was acting outside the course and scope of his employment, but only that

the coemployee's acts were taken directly toward the injured employee and were not general actions taken in the performance of the employer's nondelegable duty to provide a safe workplace. Second, I would reach the gross negligence prong of *Wicken*. On that prong, I would conclude that Stringer has presented sufficient evidence to create genuine issues of material fact and that summary judgment was inappropriate.

### A. Personal Duty

#### 1. Policy Considerations

I find that there are competing public policy concerns relating to the scope of coemployee liability. This suggests that any further restrictions on coemployee liability should be addressed by the legislature, not by this court.

On the one hand, I share the concerns expressed by the majority that unlimited coemployee liability might intrude on the compromise reached in the workers' compensation laws between employer and employees, and could erode the benefit of the immunity from tort liability that is provided to employers. The policy arguments in favor of narrowing, or even eliminating, the window for coemployee liability include these: coemployees could risk serious personal liability on a daily basis; the employer may be required to provide a defense to the coemployee, thereby diminishing the benefit of the employer's immunity; the employer may see increases in liability insurance premiums; and coemployee liability might provide the employer with a subrogation claim against the coemployee, shifting the burden for compensating workplace injuries from the employer to the employee. *See, e.g., McCluskey v. Thompson*, 363 So.2d 256, 259 (Miss.1978) (observing that permitting plaintiff to recover "would effectively transfer the ultimate burden of providing compensation

from the industry, where it belongs, to fellow servants, where it does not belong."); 6 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law*, § 111.03[2] (2004); William E. Hanna, *Coemployee Immunity: What Does It Take to Plead "Something More?,"* 53 J. Mo. Bar 77, 82 (March/April 1997).

But there are competing concerns with restricting coemployee liability. The policy arguments against narrowing or eliminating coemployee liability are these: the injured employee is entitled to be fully compensated for his injuries by all but the employer; the coemployee tortfeasor should not be relieved of the consequences of his wrongdoing; extending immunity to the coemployee would encourage fellow employees to neglect their duties; and the coemployee, who was not part of the workers' compensation compromise, did not provide any quid pro quo to support the abrogation of the injured employee's right to sue at common law. *See, e.g., Grantham v. Denke,* 359 So.2d 785, 787 (Ala. 1978) (observing that the "quid pro quo is solely between employer and employee"); *Rehn v. Bingaman,* 151 Neb. 196, 36 N.W.2d 856, 859 (1949); and *Larson,* § 111.02[2].

Because the workers' compensation laws are a creature of the legislature, which has regularly refined the elements of the compromise since the original enactment in 1913, I believe that we should look to the legislature to determine the scope of coemployee tort liability and decline any attempt to imply legislative intent from these competing policy concerns.

2. Legislative Action

This reluctance to imply legislative intent where none has been expressed is reinforced by the legal presumption that statutes should not be construed as abrogating common law rights unless they do so expressly. *Ly v. Nystrom,* 615 N.W.2d 302, 314 (Minn.2000) (declining to construe legislative intent to abrogate common law in absence of clear purpose to do so). Therefore, we need to consider whether Minnesota's workers' compensation laws expressly eliminate or restrict coemployee liability.

Minnesota Statutes § 176.031 (2004) provides immunity from tort liability to employers as follows:

The liability of an employer prescribed by this chapter is exclusive and in the place of any other liability to such employee, personal representative, surviving spouse, parent, any child, dependent, next of kin, or other person entitled to recover damages on account of such injury or death.

From its inception, that immunity has been understood to apply only to the employer and not coemployees. *See, e.g., Behr v. Soth,* 170 Minn. 278, 283, 212 N.W. 461, 463 (1927). No one argues to the contrary here.

By contrast, when other states have extended workers' compensation immunity to coemployees, they have done so expressly. *See, e.g.,* Kan. Stat. Ann. § 44–501(b) (2005) (stating that "no employer, or other employee of such employer, shall be liable for any injury for which compensation is recoverable under the workers compensation act"); N.J. Stat. Ann. § 34:15–8 (2005) (stating that "[i]f an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong"); N.Y. Workers' Comp. Law § 29, subd. 6 (2005) (workers' compensation "shall be the exclusive remedy to an employee * * * when such employee is injured or killed by the negligence or wrong of another in the same employ");

*see also* Ind.Code § 23–3–2–13 (2004) (injured employee "may commence legal proceedings" as long as alleged wrongdoer is "some other person than the employer and not in the same employ").[1] The failure of the Minnesota legislature to amend section 176.031 to similarly extend the employer's immunity to coemployees demonstrates the absence of any intent to abrogate common law coemployee liability.

To the contrary, Minnesota's workers' compensation laws expressly preserve coemployee liability. Minnesota Statutes § 176.061 (2004) preserves the liability of a "third party" to injured employees. It provides, as relevant here:

> Subd. 5. **Cumulative remedies.** If an injury or death for which benefits are payable is caused under circumstances which created a legal liability for damages on the part of a *party other than the employer,* * * * [and] the party other than the employer is not then insured or self-insured as provided by this chapter, legal proceedings may be taken by the employee or the employee's dependents * * * against the other party to recover damages, notwithstanding the payment of benefits by the employer or the special compensation fund or their liability to pay benefits.

(Emphasis added). Again, from the inception of the third party liability provision, a "third party" has been held to include coemployees. *Behr,* 170 Minn. at 283, 212 N.W. at 463. And, prior to the 1979 amendments to the third-party liability provisions, coemployee liability was based on ordinary negligence. *Id.*

In 1979, section 176.061 was amended to add the following restriction of third-party liability for a coemployee:

> A coemployee working for the same employer is not liable for a personal injury incurred by another employee unless the injury resulted from the gross negligence of the coemployee or was intentionally inflicted by the coemployee.

Act of June 7, 1979, ch. 3, § 31 (extra session 1979), 1979 Minn. Laws 1256, 1272 (codified at Minn.Stat. § 176.061, subd. 5(c) (2004)). This amendment confirms that a "third party" includes a coemployee and that coemployees are not covered by the employer's immunity from tort liability. Otherwise this amendment would have no purpose. Thus, if we look solely to legislative action to determine the scope of coemployee liability, we would conclude that there is no immunity and the only restriction is the heightened standard of gross negligence. The statute makes no mention of personal duty.

3. Case Law

The concept of personal duty originated with this court and not the legislature. But, because the legislature has apparently acquiesced in this court's recognition of a personal-duty restriction by implication, neither codifying nor eliminating it, I agree that the personal-duty prong of coemployee liability is applicable. The relevant question concerns the scope of that prong. For the reasons discussed above, I would read the judicially implied personal-duty prong narrowly, limiting our prior cases to their facts. I read the majority opinion to expand the personal-duty prong,

---

**1.** Alabama is among states that have struggled with the question of whether coemployee immunity violates state constitutional guarantees that injured persons have a due process right to a legal remedy against their wrongdoers. *See Grantham v. Denke,* 359 So.2d at 789 (holding that workers' compensation law

that bars negligence actions for damages by coemployee violated state constitution), *overruled by Reed v. Brunson,* 527 So.2d 102, 117 (Ala.1988) (holding immunity law not unconstitutional "insofar as it abolishes suits against co-employees for negligence or wantonness").

and quite broadly, when it adds the requirement that the coemployee's acts must be outside the course and scope of employment. Such a requirement is not supported by any legislative action; is not required by prior case law; it would create immunity for coemployees that is virtually coextensive with that of employers, which the statute does not do; and it would be difficult to apply. To conclude that the legislature acquiesced in the court's engrafting of a scope of employment requirement to the personal duty prong is to assume that the legislature could divine what this court might think in 2005 when these unusual facts were presented—the court has never before used the words "scope of employment" in describing the personal duty prong.

Some state legislatures have expressly restricted coemployee liability, as the majority proposes, to acts outside of the course and scope of employment. *See, e.g.,* Iowa Code § 85.20 (2005) (stating that workers' compensation remedy is exclusive right when injury caused by coemployee "arises out of and in the course of such employment and is not caused by the [coemployee's] gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another"); Ohio Rev.Code. Ann. § 4123.741 (2005) (stating that no employee may be held liable for injury "received or contracted by any other employee of such employer in the course of and arising out of the latter employee's employment"). The Minnesota Legislature has not followed the lead of these states. This legislative inaction can only be interpreted as a rejection of this type of restriction.

Our case law likewise does not support this expansion of the personal-duty prong. In fact, our decision in *Behr* is directly contrary to any restriction based on the course and scope of employment. 170 Minn. at 283, 212 N.W. at 463. Although

the statutory framework of third party liability that was before this court in *Behr* is considerably different from that presented today, two aspects of *Behr* remain fully applicable: (1) *Behr* viewed a "third party" to include coemployees and (2) *Behr* determined that the fact that the coemployee was acting within the course and scope of his employment did not limit the coemployee's liability. *Behr,* 170 Minn. at 281–83, 212 N.W. at 462–63. In *Behr,* we specifically rejected the argument that the coemployee fire chief was acting outside the scope of his employment (which would have taken the case completely outside the workers' compensation laws) when his car collided with a fire truck, injuring the plaintiff fireman. *Id.* Yet, we concluded that the fire chief was a "party other than the employer" who had legal liability for any negligence in causing the plaintiff's injuries. *Id.,* 170 Minn. at 283, 212 N.W. at 463.

This holding is significant because, years later, when we first mentioned "personal duty" in *Dawley v. Thisius,* we grounded our recognition of the right to sue a coemployee for negligence on what the majority now calls a "tangential analysis" in *Behr. Dawley,* 304 Minn. 453, 456, 231 N.W.2d 555, 557 (1975). Then, when we went on to consider how coemployee liability is affected "by the policy behind the [workers'] compensation statute," we implied a much narrower restriction than that proposed by the majority—that the act of the coemployee must constitute "direct negligence toward the plaintiff." *Id.* at 455–56, 231 N.W.2d at 557. And, in this context, our further statement—that coemployees' liability will not be imposed "because of his general administrative responsibility for some function of his employment", *see id.* at 456, 231 N.W.2d at 557—cannot reasonably be read not to incorporate any course and scope of employment standard, which had been rejected in *Behr,* but only to

emphasize that the negligence must be direct, not indirect or vicarious. This was necessary in *Dawley* because the claim was made against a manager for negligence in the performance of certain general, administrative functions. The discussion of administration is not relevant here because these coemployees were not managers and were not performing administrative functions.

Limiting *Dawley* to its facts, where the claim was based solely on the failure of a supervising coemployee to provide a safe place to work, the "personal duty" rule that emerges is that liability must be based on a coemployee's direct acts toward the injured employee and not on general actions taken in performance of the employer's nondelegable duty to provide a safe workplace.[2]

When we revisited coemployee liability in *Wicken v. Morris*, 527 N.W.2d 95, 98–99 (Minn.1995), we did not expand on *Dawley*, but merely identified the personal-duty test of *Dawley* as one prong of liability, the other being the legislature's intervening enactment of the gross negligence prong. As to personal duty, we repeated the words of *Dawley*, adding only that the duty may include acts of omission as well as commission—"The personal duty to coemployees contemplated in *Dawley* is no different than the duty any individual owes another arising from normal daily social contact—the duty to refrain from conduct that might reasonably be foreseen to cause injury to another." *Id.* at 98. And, as in *Dawley*, our ultimate decision in *Wicken* was that a supervisory coemployee could not be held liable for breach of the employ-

er's nondelegable duty to provide a safe workplace. *Id.* at 98–99.

The majority's restriction of coemployee liability to acts outside the course and scope of employment would have the effect, perhaps unintended, of providing immunity to coemployees that is essentially coextensive with that of the employer. Generally, an employer's respondeat superior liability turns on whether the employee was acting within the scope of his employment. *See, e.g., Hagen v. Burmeister & Assocs.*, 633 N.W.2d 497, 504 (Minn. 2001) (observing that "we will not impose [respondeat superior] liability unless there is some connection between the tort and the business"). Thus, the immunity given to employers essentially applies to acts of its employees performed within the cause and scope of their employment. Had the legislature intended to provide such broad and equivalent immunity to coemployees, it presumably would have done so directly by amending section 176.031 to extend the employer's immunity to its employees.

Finally, I doubt that a scope of employment test is workable in a case such as this where the coemployee's job is to provide care directly to employees. Accordingly, I would decline to broaden the test as the majority proposes and, instead, read narrowly the test already announced in *Dawley* and *Wicken*.

Given this narrower test for personal duty, I would agree with the court of appeals that the undisputed facts show Osterman and Zamberletti had a personal duty toward Korey Stringer. *Stringer v.*

---

**2.** Although not binding on us, the court of appeals has interpreted *Dawley* in this manner. *Stringer v. Minn. Vikings Football Club, LLC*, 686 N.W.2d 545, 550 (Minn.App.2004). The court of appeals observed that *"Dawley* and *Wicken* have been consistently interpreted to provide immunity from negligence actions

* * * pursuant to the employer's nondelegable duty to provide a safe workplace." *Id.* (citing *Buck v. Freeman*, 619 N.W.2d 793, 795–96 (Minn.App.2000), *review denied* (Minn. Feb. 21, 2001); *Wood v. Korn*, 503 N.W.2d 523, 525 (Minn.App.1993), *review denied* (Minn. Aug. 24, 1993)).

*Minn. Vikings Football Club, LLC,* 686 N.W.2d 545, 551 (Minn.App.2004).

### B. Gross Negligence

The concept of gross negligence, as used in other contexts, has often been referred to as a range of conduct, from great negligence to the absence of scant care. *See, e.g., State v. Bolsinger,* 221 Minn. 154, 158–60, 21 N.W.2d 480, 485 (1946); *State v. Al-Naseer,* 690 N.W.2d 744, 752 (Minn.2005). But I would conclude that one end of that range—the "want of even scant care"—is not applicable to coemployee liability because of its incompatibility with the personal-duty prong for that liability.

We have no cases establishing the standard for gross negligence for coemployee liability under the workers' compensation laws. The cases that describe gross negligence as a range that includes the want of scant care arise in contexts not particularly relevant to coemployee liability. *See, e.g., Al-Naseer,* 690 N.W.2d at 752 (discussing gross negligence in the context of the crime of vehicular homicide); *State v. Chambers,* 589 N.W.2d 466, 478 (Minn. 1999) (examining gross negligence in criminal vehicular homicide context); *Bolsinger,* 221 Minn. 154, 159, 21 N.W.2d 480, 485 (1946) (defining gross negligence in criminal context). What is unique about coemployee liability, as discussed above, is that we do not even reach the gross negligence question unless a personal duty has been established—some act of direct negligence toward the injured employee. When the personal-duty prong is coupled with the gross-negligence prong, the notion of scant care appears to have no place.

As applied to the claims before us, Stringer alleges 25 acts of commission and omission that amount to gross negligence and she supports those allegations with expert affidavits. The use of a scant-care standard would focus not on those acts where the care was negligently performed or was negligently not performed, but on what other care was given. The fact that a caregiver performed some acts that were not themselves negligent (i.e. bringing Korey Stringer to the air conditioned trailer for evaluation, offering water) should not be considered to excuse the negligent performance or failure to perform the other acts that are alleged to have been required by due care.

Accordingly, I would describe the gross negligence standard for coemployee liability in terms of what it is—negligence of a high degree, great negligence, more than ordinary negligence but less than wanton and willful conduct—and not in terms of what it is not—the provision of scant care. And under that standard, Stringer has presented sufficient evidence to create genuine issues of material fact that the conduct of Osterman and Zamberletti was grossly negligent. Accordingly, summary judgment should be reversed and the matter remanded for trial.

MEYER, Justice (dissenting).

I join in the dissent of Justice Hanson.