Raymond P. GIBBERD (Deceased), by
Elizabeth C. GIBBERD, Respondent,

v.

CONTROL DATA CORPORATION,
Self–Insured, Relator.

No. C2–87–1481.

Supreme Court of Minnesota.

May 20, 1988.

Richard Riemer and Jeff M. Zalasky, Minneapolis, for relator.

Mary J. Bjorkland, Bloomington, for respondent.

KELLEY, Justice.

The ultimate issue for resolution in this case is whether the dependents of an employee, a victim of a random street killing, are entitled to recover workers' compensation benefits from his employer when the victim was killed while away from the employer's premises during his meal break. A compensation judge held that they were not. The workers' compensation court of appeals (WCCA) reversed, and awarded dependency and funeral benefits. We reverse and reinstate the decision of the compensation judge.

Basically, the facts leading up to the killing are undisputed. At approximately 8:30 on the evening of August 26, 1985, Raymond P. Gibberd, an employee of appellant Control Data Corporation (CDC), was shot and killed during the course of an apparent random street assault while walking along a public street some distance from CDC's facility located at 304–306 Dale Street in St. Paul. When assaulted, Gibberd was walking toward the CDC facility. Evidence indicated he had left his work station and checked out of the CDC facility a short time before—apparently on a meal break. No reason has been established for the killing. No personal connection between Gibberd and his assailant has ever been established. There was no evidence that the motive for the killing was robbery. No evidence exists that the assault arose out of anything having to do with Gibberd's employment at CDC. Rather, the police authorities, who conducted an extensive investigation of the incident, have concluded that Gibberd was a victim of a random, senseless, street assault and execution.[1] Gibberd left surviving him a wife and two minor daughters. They filed a claim for dependency and funeral benefits under the Workers' Compensation Act. CDC, in its answer to the claim, denied that Gibberd's death arose out of and in the course of his employment, and further denied that he was on the employer's premises at the time he was fatally shot.

The CDC facility in St. Paul, where Gibberd worked, is known as a World Distribution Center. It is located immediately south of U.S. Interstate 94. At the facility, CDC employs approximately 400 people on the day shift, 20 people on the second shift, and 5 people on the third shift. CDC located the World Distribution Center at its current location as part of a corporate policy favoring building of work facilities in so-called "depressed" inner-city areas. This policy coincides with widely publicized and generally known efforts of St. Paul municipal authorities to address social and economic problems in that same general area by encouraging renovations of commercial and residential buildings located in the area.

The evidence in the case revealed that 12 cities in the United States are roughly comparable in size to the City of St. Paul. Seven of those are considered to have a higher crime rate than does St. Paul.[2] In St. Paul the police department has divided the city into 198 "grids." CDC's World Distribution Center is located in "grid 109."

---

1. Approximately an hour after the assault a William Mitchell law student was shot in the head under similar circumstances near the William Mitchell Law School which is located a short distance from, and in the general vicinity, of the CDC plant in the City of St. Paul.

2. Evidence exists suggesting that St. Paul's sister city, Minneapolis, may have had a higher incidence of crime than did St. Paul.

In 1985 this "grid" ranked 19th in crime rate in St. Paul. Other "grids" surrounding "grid 109" ranked 5th, 7th, 11th and 30th. In the five years preceding the assault on Gibberd, crime had decreased dramatically in the general area—particularly to the south of the CDC plant.[3] Apparently people have been inquiring about and moving with increasing frequency into the general area.[4] Although CDC employees had reported to company officials a number of incidents of minor vandalism, purse thefts, and other thefts from employees during the five years preceding this assault, there had been only two assaults on persons reported.[5]

CDC provided a cafeteria on its premises for employees. Because most employees worked on the day shift, this cafeteria closed at 3 p.m. Vending machines on the premises provided candy, popcorn, sandwiches, potato chips, etc. A microwave oven was also available for use by employees. CDC had no implied or express policy which required employees to leave the CDC premises to eat out. Management did encourage employees to patronize the cafeteria during the hours it was open, but there existed no policy requiring employees to do so. In fact, CDC management was aware that many employees did take their lunch break away from the premises—particularly at an establishment known as Wendy's Fast Food Restaurant located approximately $\frac{7}{10}$th of a mile from the plant.

Gibberd was employed as a computer consultant. He was considered an "exempt" employee. As an "exempt" employee, although his regularly scheduled working hours were 8 a.m. to 5 p.m., he had considerable latitude in setting his own working hours. However, as an exempt employee, any hours worked over 40 hours per week were uncompensated. For some time before and on the day of the assault, Gibberd had been working on a project involving retrieval of information from broken computers. Because demand for computer time was heavy during the regular 8 to 5 shift, when most of the CDC World Distribution Center employees were on duty, during August 1985, while working on this project, Gibberd worked frequently at night and on weekends.

On August 26 at approximately 4:15 p.m. and later about 7:15 p.m., Gibberd informed his family by telephone that he would be working late and not be coming home to eat. In the latter conversation, he mentioned he would shortly go out for a "bite to eat." He actually signed out on CDC's security log at 8:05 p.m. He apparently did not shut down the computer on which he was working because it was found to be running the next morning. Likewise, his briefcase was found open; the lights at his work station were on; and his books and papers were covering his desk.

No CDC employee saw Gibberd after he signed out. However, about one-half hour later, an eyewitness noticed Gibberd walking south on the east side of Dale Street in the direction of and approximately four blocks from the World Distribution Center. Suddenly an unidentified male accosted Gibberd; placed an armlock on his neck; shot him in the head with a pistol; and, after Gibberd was on the ground, shot him a second time in the head.

The time Gibberd signed out from the plant; the state in which he had left his work station; the time the eyewitness ob-

---

**3.** The record shows that the difference between the 19th and the 30th "grid" amounted only to 10 incidents of reported crime per annum. It also shows that "grid" 109 had 299 offenses during the reporting period, while the area in St. Paul reporting the highest evidence of crime was downtown St. Paul with 806 offenses reported for the same period.

**4.** Testimony of Wendy Guck, research analyst for the St. Paul Police Department, indicates that her department receives inquiries from persons interested in residing in areas adjacent to "grid 109," which is not densely populated, con-

cerning the availability of housing, status of safety, etc.

**5.** On one occasion in 1982, a woman employee had been accosted by a male in the parking lot when returning to the plant from a lunch break but was not physically harmed. In 1983 the wife of an employee while driving along Interstate 94, for unexplained reasons, had her windshield shattered by a rock which had been thrown through it. She did receive some slight injuries from broken glass.

served the assault; plus subsequent autopsy findings revealing partially undigested food estimated to have been ingested within a half hour prior to death; all combined to lead investigating authorities to conclude that he had recently eaten at Wendys.

Findings made by the compensation judge were: (1) No causal connection existed between Gibberd's death and his employment; (2) No personal connection existed between Gibberd and his assailant; (3) Gibberd's death did not occur in, on, or about the premises of CDC; and (4) Gibberd's death did not arise out of and in the course of his employment with CDC. On appeal to the WCCA those "findings" were rejected and in their stead the WCCA entered "findings" diametrically opposite thereto, to-wit: that "as a matter of law" Gibberd's death arose out of his employment; that at the time of his death Gibberd was engaged "in, on, or about the premises where his services required his presence"; that his death was compensable since the assault occurred because of his employment and not for personal reasons; and that "it must be inferred" that Gibberd's employment exposed him to a different and greater hazard of injury from assault than if he had been pursuing ordinary personal affairs.

The appropriate standard of review is of pivotal significance in the resolution of the issues raised by this case since the WCCA essentially rejected the compensation judges' findings and substituted its own. For many years prior to 1983 upon review of referee or compensation judge findings, first the Industrial Commission and later the WCCA could, in essence, ignore those findings and proceed to find the facts anew by giving little or no deference to the findings of the referees or compensation judges—a procedure basically followed by the WCCA in this case. *See, e.g., Dotstry v. Radisson Hotel,* 266 N.W.2d 716, 717 (Minn.1978); *Townsend v. Nelson,* 308 Minn. 374, 376, 242 N.W.2d 607, 608–09 (1976). However, as a result of amend-

ments made to Minn.Stat. § 176.421, subd. 1(3) and Minn.Stat. § 176.441, subd. 1, by enactment of 1983 Minnesota Laws, chapter 301, the theretofore essentially unrestrained power of the WCCA to set aside compensation judge findings and orders was considerably circumscribed. Act of June 8, 1983, ch. 301, §§ 148 and 151, 1983 Minn.Laws 1558, 1668–70. *See, e.g., Hengemuhle v. Long Prairie Jaycees,* 358 N.W.2d 54, 59–60 (Minn.1984). Thereafter, the former plenary discretion resting in the WCCA upon review to disregard factual findings of a compensation judge was limited in that if "more than one inference may reasonably be drawn from the evidence, the findings of the compensation judge are to be upheld." *Id.* at 60. In *Hengemuhle* we further held that the WCCA is not "to substitute its view of the evidence for that adopted by the compensation judge if the compensation judge's findings are supported by evidence that a reasonable mind might accept as adequate." *Id. See also Polaschek v. Asbestos Products, Inc.,* 361 N.W.2d 37, 42 (Minn.1985) (reinstating a finding of a compensation judge that a reasonable mind could accept as adequate); *Jacobowitch v. Bell & Howell,* 404 N.W.2d 270, 274 (Minn.1987); *Hodge v. Hodge Constr.,* 376 N.W.2d 694, 698 (Minn.1985).

■ On appeal from the WCCA this court's function is somewhat different. If the WCCA substitutes its findings for those of the compensation judge, our inquiry centers on whether the WCCA correctly substituted its findings, and, secondly, if so, whether the WCCA's substituted findings nevertheless should be set aside. *Hengemuhle,* 358 N.W.2d at 61. The focus of our scrutiny of the record is on whether the WCCA's rejection of the compensation judge's findings and substitution of its own was clearly and manifestly erroneous in light of its duty not to reject those findings unless they are unsupported by substantial evidence. *Id.* at 60. *See also Nord v. City of Cook,* 360 N.W.2d 337, 341 (Minn.1985).[6]

---

6. In *Hengemuhle,* 358 N.W.2d at 60 we held:
[I]n applying the substantial evidence standard, where the evidence is conflicting or more than one inference may reasonably be

drawn from the evidence, the findings of the compensation judge are to be upheld. In other words, the court of appeals is not to substitute its view of the evidence for that adopted

The question for this court on review, then, is: when it rejected the "findings" and orders of the compensation judge and substituted diametrically opposite "findings" and order, did the workers' compensation court of appeals exceed the scope of its appellate review?

Our inquiry begins, then, by examining whether Gibberd's death is compensable. Minn.Stat. § 176.011, subd. 16 (1984) defines the "personal injury" compensable under the Workers' Compensation Act as one which arises out of and in the course of employment while the employee is engaged in or about the employer's work premises. The same statute excludes from compensation any injury caused by a third person which was intended to injure the employee or was not directed against the employee as a result of the employment.[7]

Since the inception of the workers' compensation law, courts have repeatedly experienced difficulty when attempting to ascertain the scope of the two phrases "arising out of" and "in the course of." We have recognized that no one comprehensive definition can be fashioned to fit all cases and that each case must to a great extent "stand on its facts," but we have likewise recognized that a causal connection—not necessarily in the proximate cause sense—must exist between the injury and the employment. See, e.g., Novack v. Montgomery Ward & Co., 158 Minn. 495, 198 N.W. 290 (1924); Harris v. Kaul, 149 Minn. 428, 183 N.W. 828 (1921). The very words "arising out of" connote a causal connection, whereas "in the course of" refers to the time, place, and circumstances of the incident causing the injury. See, e.g., Lange v. Minneapolis–St. Paul Metro. Airports Comm'n, 257 Minn. 54, 99 N.W.2d 915 (1959). In a number of our cases arising prior to 1983, by weighing into the balance the then prevailing precept that the workers' compensation law was to be given a broad and liberal construction in recognition of its supposed remedial purpose, the outer inclusive scope of the definition of the phrase "arising out of" was expanded. See, e.g., Simonson v. Knight, 174 Minn. 491, 219 N.W. 869 (1928); LeBar v. Ewald Bros. Dairy, 217 Minn. 16, 13 N.W.2d 729 (1944); Olson v. Trinity Lodge No. 282, A.F. & A.M., 226 Minn. 141, 32 N.W.2d 255 (1948). By enactment of 1983 Minnesota Laws, chapter 290, the legislature mandated that no longer should the former rule of liberal construction based upon a perceived remedial basis weigh in the analysis—a factor we must have in mind when using older cases as precedents in deciding cases arising after 1983.[8]

by the compensation judge if the compensation judge's findings are supported by evidence that a reasonable mind might accept as adequate.

7. The full text of Minn.Stat. § 176.011, subd. 16 (1984) reads:
'Personal injury' means injury arising out of and in the course of employment and includes personal injury caused by occupational disease; but does not cover an employee except while engaged in, on, or about the premises where his services require his presence as a part of such service at the time of the injury and during the hours of such service. Where the employer regularly furnished transportation to employees to and from the place of employment such employees are subject to this chapter while being so transported, *but shall not include an injury caused by the act of a third person or a fellow employee intended to injure the employee because of reasons personal to him, and not directed against him as an employee, or because of his employment.* (Emphasis added).

8. The 1983 statute amended Minn.Stat. § 176.001 (1986) by adding thereto:

It is the specific intent of the legislature that workers' compensation cases shall be decided on their merits and that the common law rule of 'liberal construction' based on the supposed 'remedial' basis of workers' compensation shall not apply in such cases. The workers' compensation system in Minnesota is based on a mutual renunciation of common law rights and defenses by employers and employees alike. Employees' rights to sue for damages over and above medical and health care benefits and wage loss benefits are to a certain degree limited by the provisions of this chapter, and employers' rights to raise common law defenses such as lack of negligence, contributory negligence on the part of the employee, and others, are curtailed as well. Accordingly, the legislature hereby declares that the workers' compensation laws are not remedial in any sense and are not to be given a broad liberal construction in favor of the claimant or employee on the one hand, nor are the rights and interests of the employer to be favored over those of the employee on the other hand.

Act of June 7, 1983, ch. 290, § 25, 1983 Minn. Laws 1310, 1324.

Applying the principles of "arising out of," and "in the course of" employment, the compensation judge found "no facts of record from which * * * [he] can infer that the killing had anything to do with Mr. Gibberd's status as an employee of Control Data Corporation." The WCCA rejected that "finding," and held that "[a]s a matter of law the employee's death arose out of his employment." In so doing, it relied upon two cases decided more than 45 years ago at a time when the predecessor to the present Workers' Compensation Court of Appeals (the Industrial Commission) could independently find facts when this court would rarely disturb those findings,[9] and when the courts applied the "rule of liberal construction": *Corcoran v. Teamsters & Chauffeurs Joint Council No. 32*, 209 Minn. 289, 297 N.W. 4 (1941); *Hanson v. Robitshek–Schneider Co.*, 209 Minn. 596, 297 N.W. 19 (1941). In *Corcoran* we sustained a commission finding of coverage. In doing so we specifically relied upon the rule, then in effect, that commission findings supported by sufficient evidence would not be reversed on appeal as well as upon the prior rule of liberal construction. *Corcoran* 209 Minn. at 297, 297 N.W. at 8. In *Corcoran*, the only permissible inference that could be drawn from the evidence was that the employee's death arose out of his employment. At the time he was assaulted, Corcoran, a union organizer, had been working at night, was in the process of leaving his employer-owned automobile, was carrying a briefcase containing union papers relevant to his employer's business about which he had expressed to a fellow employee his intention to work on for use in a conference on the following day. However, most importantly, prior to his death Corcoran had received numerous threats of physical injury from those opposed to his union organizing activities. Combined with other facts, those threats certainly weighed heavily in the conclusion that the assault in *Corcoran* arose from his employment activities as a union organizer.

In *Hanson*, likewise, the only permissible inference from the known facts was that the assault on Hanson arose out of his employment. At the time of the assault, Hanson, a traveling salesman, although away from his employer's premises, was undoubtedly engaged in his employment at the precise time of the assault. The purpose of his trip from his employer's premises to his personal automobile was not personal to him; rather, it was to further the interests of his employer. Hanson was working at night with his employer, and had been marking and tagging samples and placing the samples in sample cases. He left the employer's premises to get his car so that the sample cases could be transferred into it preparatory to his next day's sales trip into Iowa. It was while on that errand to get the car that he was assaulted. Under those circumstances, a holding that his death "arose out of his employment" is not only understandable but any other conclusion would have been logically impermissible.

In neither *Corcoran* nor *Hanson* did facts exist from which any inference other than that the assault "arose out of" the employment could be drawn. In the instant case, that is not so. In fact, there are no facts in the record that permit an inference that at the time of the assault on Gibberd he was in any way providing a service to his employer. Moreover, since *Corcoran* and *Hanson* were decided, the standards of review for workers' compensation cases have been curtailed, and the supposed remedial nature of workers' compensation laws is no longer recognized by statutory direction. For these reasons, neither *Corcoran* nor *Hanson* afford precedent to hold that as a matter of law Gibberd's death arose out of his employment.

Perhaps a more appropriate and useful analysis in resolving whether Gibberd's death is compensable is that underlying the "meal break" cases. A superficial reading of our "meal break" cases might lead one to initially conclude that in this area the

9. *See, e.g., Anderson v. Associated Milk Producers, Inc.,* 306 N.W.2d 542, 543–44 (Minn.1979);

*Townsend,* 308 Minn. at 376, 242 N.W.2d at 609.

court has arrived at seemingly contradictory and inconsistent decisions. In support of their position, respondents, for example, cite such cases as *Lassila v. Sears, Roebuck & Co.*, 302 Minn. 350, 224 N.W.2d 519 (1974); *Krause v. Swartwood*, 174 Minn. 147, 218 N.W. 555 (1928); *Goff v. Farmers Union Accounting Serv., Inc.* 308 Minn. 440, 241 N.W.2d 315 (1976); *Faust v. State Dep't of Revenue*, 312 Minn. 438, 252 N.W.2d 855 (1977); *Sweet v. Kolosky*, 259 Minn. 253, 106 N.W.2d 908 (1960). In each of those cases the employee's injury which had occurred during a "meal break" was either found by this court to be compensable or an Industrial Commission finding to that effect was affirmed. To the contrary, however, as appellant correctly observes, the court has either denied compensability or affirmed Industrial Commission findings denying compensation in such cases as *Bronson v. Joyner's Silver & Electroplating, Inc.*, 268 Minn. 1, 127 N.W. 2d 678 (1964); *Callaghan v. Brown*, 218 Minn. 440, 16 N.W.2d 317 (1944); and *Satack v. State Dep't of Public Safety*, 275 N.W.2d 556 (Minn.1978).

Upon closer examination, however, this seeming inconsistency emerges as being, in fact, more apparent than real. Those cases awarding compensation to employees while on a meal break are explainable either because the injury clearly occurred at a place considered to have constituted a part of the employer's working premises or because this court afforded pre–1983 deference to Industrial Commission findings. Thus, in *Lassila* the employee's injury was incurred in a cafeteria furnished by the employer; in *Krause* the employee was "on duty" for her employer during a lunch break; in *Goff* the employee was injured on her way from the office building to a parking lot furnished by the employer; in *Faust* the state had implicitly encouraged employees to eat lunches in a park it had furnished;[10] and in *Sweet* the court, in affirming an Industrial Commission award of compensation, relied heavily on the liberal interpretation rule.

In contrast, absent the existence of a work errand, absent reliance upon the pre–1983 liberal interpretation rule, or when the employee's injury occurred on the public street away from an area not deemed to be the "employment premises," compensation has been denied. Thus, in *Bronson*, survivors of employees killed during a meal break at a public street intersection when their car collided with a train at a crossing located a short distance from the employment premises were denied compensation; in *Callaghan* survivors of employee killed in a public street while returning from a coffee break were denied compensation; in *Satack* the employee was denied compensation when injured on a public sidewalk near but not part of the "employment premises"; and in *Blanks v. Oak Ridge Nursing Home*, 281 N.W.2d 690 (Minn.1979), an employee injured on a boulevard adjacent to and in front of the place of employment was denied compensation. *See also Sommers v. Schuler Chocolates*, 239 Minn. 180, 58 N.W.2d 194 (1953). The rule to be extracted from the cases appears to be that an employee's injury (or death) incurred during a "meal break" is compensable under the workers' compensation law if (a) it occurred at a place that can reasonably be construed to be a part of the "employment premises", or (b) if it occurred at a time when the employee, in addition to reasons personal to himself, i.e. seeking sustenance, was furthering the employer's interests. If, however, the injury (or death) occurred in a public street and the hazard encountered was no greater than that to which all others not so employed would be exposed if they chose to traverse the way, it is not compensable unless other exceptions to Minn.Stat. § 176.011, subd. 16 (1984) apply.

One of those other exceptions is known as the "special hazard" exception, which respondents contend is applicable. Under that doctrine an employee's injury (or death) may be compensable where the manner in which the injury or death oc-

---

**10.** This holding was by the narrowest of majorities. Justice Otis, writing for the dissenters, protested the majority ruling as, in effect, affording health and accident insurance rather than statutory workers' compensation. *Faust,* 252 N.W.2d at 857.

curred arose from a "special hazard" even though the hazard is physically separated from the employer's premises provided that the hazard is causally connected to the employment and particular to it. *See, e.g., Johannsen v. Acton Construction Co.*, 264 Minn. 540, 119 N.W.2d 826 (1963). It is obvious, of course, that whether the "special hazard" exception is applicable at all depends upon a determination of whether, in fact, a special hazard exists. Even though the basic facts in the instant case are largely without dispute, reasonable persons could draw different inferences from those basic facts—as they did. It cannot be said the compensation judge's implicit finding negating the existence of any special hazard causally connected to and particular to the employment is unreasonable. The evidence of reported incidents of crime comparable with other areas of St. Paul, "downtown" for example, reasonably supports the compensation judge's conclusion. A contrary inference, implicitly drawn by the WCCA, likewise cannot be categorized as being unreasonable. The same reported "incidents of crime" figures showed that other areas of St. Paul had figures lower than the area where this assault occurred. That either inference could reasonably be drawn highlights the conclusion that since the 1983 amendments, now codified in Minn.Stat. § 176.421, subd. 1(3) and Minn. Stat. § 176.441, subd. 1, as interpreted by us in *Hengemuhle*, the compensation judge's conclusion should not have been set aside.

■ Additionally, we note the facts in this case differ from those typically present in most of the cases where the "special hazard" exception has been followed. The exception is applicable only if by virtue of the employment the employee is exposed to a hazard which originates on the employment premises, is a part of the working environment, or if it peculiarly exposes the employee to an external hazard which subjects the employee to a greater personal risk than one has when pursuing ordinary personal affairs. *See, e.g., Nelson v. City of St. Paul*, 249 Minn. 53, 81 N.W.2d 272 (1957) (teacher on way to work struck by ball batted from employer's school yard); *Olson v. Trinity Lodge No. 282, A.F. & A.M.*, 226 Minn. 141, 32 N.W.2d 255 (1948) (employee injured in slip on access to employer's premises which was within his zone of work). That the scope of the exception has outer limits is demonstrated by *Nelson*, 249 Minn. at 58, 81 N.W.2d at 277. The compensation judge observed that adoption of respondent's position would expand the "special hazard" exception to cover risks occurring blocks away from and totally unrelated to the employment activity on CDC's premises where, as here, there exists nothing but the most attenuated nexus between the random street crime and the employment. If the "special hazard" exception is expanded to hold it applicable in this factual setting, no logical reason exists prohibiting its further extension to impose liability on all Minnesota employers whose employees sustain injuries or death on the streets or highways while going to or returning from work. The same minimal nexus to the employment would be present and the result would likewise ensue: to expanding by judicial construction the statutory workers' compensation system into substantially a compulsory health and accident insurance program. *Cf. Faust v. State Dep't of Revenue*, 312 Minn. 438, 252 N.W.2d 855, 857 (Otis, J., dissenting).[11]

■ Finally, respondents claim that Gibberd's death was the result of an assault not caused by reasons personal to him, and that therefore it must be deemed compensable as arising from his employment. The pertinent statutory provision reads: "[a compensable injury] shall not include an injury caused by the act of a third person * * * intended to injure the employee be-

---

11. Respondents also claim that the "special errand" exception is applicable. *Nehring v. Minnesota Mining & Mfg. Co.*, 193 Minn. 169, 258 N.W. 307 (1935). Unlike the cases where the "special errand" rule has applied, in this case Gibberd had not been called out on a special errand which was the reason for his presence on the public street. The "special errand" exception has no application to these facts. *See also Youngberg v. Donlin Co.*, 264 Minn. 421, 119 N.W.2d 746 (1963).

cause of reasons personal to him, and not directed against him as an employee, or because of his employment." Minn.Stat. § 176.011, subd. 16 (1984).

In this case all that is known is that Gibberd was assaulted on a public street by a person who obviously intended to injure or cause his death. The compensation judge inferentially found the assault had no nexus with Gibbard's employment. Facts exist from which an inference could be drawn that the assault may have been racially or socially motivated. In contrast, had Gibberd at the time of the assault been displaying or wearing his CDC identification badge, which, at best is conjectural, such fact if it existed might lend support to an inference that the assault was directed against him as a CDC employee. Thus, conflicting but permissible inferences both rest upon speculation. When the facts, and permissible inferences therefrom, support either inference, this court affirms the appropriate fact finder. *See, e.g., Hanson v. Robitshek–Schneider Co.*, 209 Minn. 596, 600, 297 N.W. 19, 22 (1941) (at that time the Industrial Commission). When the WCCA inferentially substituted its own "findings," which were no more supported by substantial evidence in the record as a whole than were those "findings" inferentially made by the compensation judge, under *Hengemuhle* the findings of the compensation judge, the appropriate fact finder, are to be upheld. *Hengemuhle v. Long Prarie Jaycees*, 358 N.W.2d at 60 (Minn. 1984).

The underlying purpose leading to the institution of the workers' compensation system—that employers bear the costs of damages sustained by employees and their survivors for injuries or death arising out of and in the course of the employment relationship—is not furthered by imposing responsibility upon employers for random assaults, having no nexus to the employment and which occur away from the employer's premises at times when employees are in pursuit of their own personal ends. Such expansion, instead, would be antithetical to that basic purpose by converting the statutory workers' compensation system into a compulsory health and accident insurance scheme by which every employer would be made liable for all injuries sustained by employees from the time of leaving for, and returning home from, work. Such a conversion involves policy considerations bearing a number of social, political, and fiscal ramifications that can more appropriately be addressed by the legislature, the branch of government which established and has historically monitored and changed the scope of coverage under the workers' compensation system, rather than by this court.

We reverse the holding of the workers' compensation court of appeals and affirm the conclusions of the compensation judge that the facts, and inferences reasonably to be drawn therefrom, do not establish that Raymond Gibberd's death arose out of and in the course of his employment.

YETKA, Justice (dissenting).

I would affirm the court of appeals because I think it clearly acted within its authority to apply the *Hanson v. Robitshek–Schneider Co.*, 209 Minn. 596, 297 N.W. 19 (1941), and *Sweet v. Kolosky*, 259 Minn. 253, 106 N.W.2d 908 (1960), decisions. The facts are not in dispute in this case; thus, the court applied its understanding of the law to those facts. It is this court which is exceeding its normal appellate review rules in overturning the Workers' Compensation Court of Appeals, not the latter in reversing the compensation judge.

This was a high-crime area. The company knew that when it located its plant there. The employee was engaged in a special project that required him to work at night after regular hours. Thus, even though the majority opinion correctly points out that the statutes no longer require a liberal construction in favor of the employee, the court of appeals properly applied *existing law*. They did nothing more than this court has been doing in workers' compensation cases for 70 years. Applying existing law is not a radical departure from the past.

Moreover, in my opinion, the facts here make a far more compelling case than those in *Hanson* and *Sweet* where compensation was paid. In *Sweet*, for example, the employee was actually out on a coffee break.

In my view, the majority opinion creates a great uncertainty in the entire compensation law field. The opinion signals that this court will engage in fact-finding of its own in these cases and will not hesitate to substitute its findings for those of the Workers' Compensation Court of Appeals in so doing. We have frequently criticized the Minnesota Court of Appeals for engaging in that same practice. We should follow our own advice on the subject.