**Kristel KUBIS, Respondent,**

v.

**COMMUNITY MEMORIAL HOSPITAL ASSOCIATION, and Greater Minnesota Self-Insurance Fund, with claims administered by Meadowbrook Insurance Group, Relators,**

**and**

**Essentia Health Systems and St. Luke's Clinics, Intervenors.**

A16-0361

Supreme Court of Minnesota.

Filed: June 28, 2017

Gina M. Uhrbom, Brown & Carlson P.A., Minneapolis, Minnesota, for relators.

James B. Peterson, Falsani, Balmer, Peterson, Quinn & Beyer, Duluth, Minnesota, for respondent.

Mark A. Kleinschmidt, Cousineau McGuire Chartered, Minneapolis, Minnesota, for amicus curiae Minnesota Defense Lawyers Association.

## OPINION

ANDERSON, Justice.

At the end of her shift, respondent Kristel Kubis fell and injured her shoulder while rushing up a staircase at the workplace of her employer, Community Memorial Hospital Association (CMH). Kubis filed a claim for workers' compensation benefits. The compensation judge held a hearing, found that Kubis failed to prove by a preponderance of the evidence that her injury arose out of her employment, and denied the claim. Kubis appealed to the Workers' Compensation Court of Appeals (WCCA), which reversed the compensation judge's decision. Because we conclude that the WCCA impermissibly substituted its own view of the evidence for that of the compensation judge, we reverse the WCCA's decision and reinstate the compensation judge's decision.

## FACTS

Kubis, a 54-year-old registered nurse, began working at CMH in 2006.[1] Her position as a medical-surgical nurse at CMH required her to be on her feet for most of her shift. At the compensation hearing, Kubis testified that her knees would become fatigued after working long hours.

On June 17, 2014, Kubis worked her scheduled shift from 3:00 p.m. to 11:30 p.m. This was the fourth day in a row that

---

1. Before working at CMH, Kubis was employed outside the nursing industry from 1989 to 2003. During this time, Kubis suffered a left knee injury, which required surgery. Following this procedure, Kubis elected to go to nursing school.

Kubis had worked. At the end of her shift, Kubis was "in report" on the second floor, which involved giving the incoming shift of nurses a report on patients and often would occur after the end of a nurse's actual shift. At 11:45 p.m., as Kubis was reporting, a code was called on the ground floor. The code was a "mock code" that simulated a medical emergency.[2] Kubis received permission from her direct supervisor that evening to respond to the code.

After responding to the mock code and attending the debriefing that followed, Kubis needed to return to the second floor to complete her report to the next shift and clock out. Kubis testified that she wanted to go upstairs because she was "afraid of the overtime" and she "wanted to report off to the next crew." Kubis looked across the hallway toward the elevators and saw that the doors to one of the three elevators were closing. These elevators are open to the public. Kubis decided to take the stairs rather than call for a different elevator because she believed that using the stairs was faster than waiting for another elevator. The stairs at CMH also are open to the public. Kubis generally did not take the stairs at work because she feared tripping. As Kubis hurried up the stairs, she tripped and fell. There is a handrail on each side of the stairwell, the stairwell itself was not defective in any way, and there was nothing on any of the stairs that could have caused the fall.

Before her fall, there had been general discussions at CMH about limiting overtime, specifically, "unnecessary overtime." These concerns related to employees completing their work duties, but then failing to clock out immediately and staying past the end of their shift. There was no written policy at CMH regarding limiting overtime. Kubis's direct supervisor testified at

the hearing before the compensation judge that "unnecessary overtime" does not include responding to a code or completing the report to the next shift after the employee's assigned shift has ended. Employees also were instructed not to rush or hurry their job duties to avoid overtime because CMH "deal[s] with people's lives."

Also before her fall, Kubis and her direct supervisor discussed performance issues Kubis was having at work. As a result of these issues, the direct supervisor advised Kubis "to stay and complete her documentation, thus authorizing overtime." The direct supervisor never told Kubis that the performance issues related to her working overtime or that she was being disciplined for working overtime. In fact, Kubis had worked overtime in 10 of the 13 pay periods preceding her fall. Kubis often worked overtime because she "always [went] in to report last." Even though she always reported last, Kubis testified that she was "afraid" of working overtime.

Kubis went to the emergency room the day after she fell. Almost one month later, her doctor placed her on a work restriction, prohibiting her from using her right arm. Because CMH was unable to accommodate this restriction, she has never returned to work at CMH. Her last day of employment at CMH was July 15, 2014. Kubis had shoulder surgery on October 20, 2014, but she continues to experience pain in her shoulder and down her right arm.

Kubis filed a claim petition for workers' compensation benefits, and a compensation judge held a hearing on the claim. Before the hearing, the parties stipulated that all of the medical expenses at issue were related to her right shoulder injury, were reasonable and necessary, and were causally related to Kubis's fall. The parties also

**2.** Employees are not notified whether the code is mock or real when it is called. If a CMH nurse is in the hospital when a code is called, the nurse is expected to respond.

stipulated that Kubis's period of temporary partial disability began on July 15, 2014, and that her average weekly wage on the date of the injury was $1,370.64.[3] The only issue contested at the hearing was whether Kubis's right shoulder condition was a compensable work injury arising out of her employment.

Kubis was the only witness to testify in support of her claim at the hearing. Shelly Demers, director of staff education and infection prevention, and Sarah Motschenbacher, director of inpatient services, testified on behalf of CMH. Additionally, CMH submitted an expert report from an architect and photographs of the lobby and stairwell at CMH. The report and photographs demonstrate that there was nothing hazardous about the staircase on which Kubis fell.

Following the hearing, the compensation judge filed findings of fact and an order that denied and dismissed Kubis's claim. The compensation judge acknowledged that, as Kubis testified, "she sometimes ends up on overtime when she is engaged in reporting information to members of the oncoming shift, as she was doing on the night of the injury," but found that Kubis "has never received a written warning for working overtime in those circumstances." The compensation judge also noted Kubis's assertion that "her right shoulder injury arose out of her employment because she was rushing up the stairs to log off as quickly as possible to comply with management's directive." Most important to this appeal, the compensation judge found that her "claim that she was rushing up the stairs because she felt pressured to do so because of the hospital policy encouraging employee's [sic] to log out on a timely basis at the end of their shifts *is not*

credible." (Emphasis added.) Accordingly, because Kubis failed to establish by a preponderance of the evidence that her injury was caused by an increased risk that arose out of her employment, the compensation judge determined that her injuries were not compensable.

The WCCA reversed. *Kubis v. Cmty. Mem'l Hosp. Ass'n*, No. WC15-5842, 2016 WL 845830, at *5 (Minn. WCCA Feb. 5, 2016). The WCCA explained that the issue on appeal was "whether the employee's employment increased her risk of injury" and therefore established that her injury arose out of her employment. *Id.* at *3. The WCCA then identified two reasons from the record that could support the claim of increased risk: "fatigue and hurrying." *Id.* at *4-5. The WCCA concluded that there was a lack of substantial evidence to support Kubis's fatigue claim. *Id.* at *4. As for her claim of hurrying, the WCCA looked to "two different motivations, concern over accruing overtime and needing to promptly report to the oncoming shift." *Id.* at *5.

The WCCA did not disturb the compensation judge's finding that Kubis's concerns over accruing overtime lacked credibility. *Id.* But, the WCCA determined that Kubis's claimed second motivation, the need to "promptly report to the oncoming shift," was "not addressed by the employer and insurer or the compensation judge." *Id.* The WCCA concluded that Kubis "was rushed to report to the next shift" and held that, "[w]here an employee who normally avoids the stairs due to prior knee problems, takes them because she feels rushed to report to the next shift, and in the process runs up the stairs and falls, the arising out of element is established."

**3.** Kubis's claim was for temporary partial benefits because she provided care for her brother and received payments from HealthS-

tar for that care. Her stipulated weekly wage included wages from CMH and HealthStar.

*Id.* Accordingly, the WCCA "reverse[d] the compensation judge's decision and [found] that the employee's injury arose out of her employment." *Id.*

## ANALYSIS

■ On appeal, CMH argues that the WCCA erred by failing to adhere to the appropriate standard of review; that the WCCA erred as a matter of law in how it applied the increased-risk test set forth in *Dykhoff v. Xcel Energy*, 840 N.W.2d 821 (Minn. 2013); and that an injury sustained because of an employee's "subjective belief" of a need to rush without an increased risk occasioned by employment, such as a defect in the staircase, cannot satisfy the increased-risk test. Because we agree that the WCCA erred by failing to adhere to the appropriate standard of review, we need not decide whether the WCCA erred in its application of the increased-risk test or whether an employee's subjective belief establishes an increased risk sufficient to prove that an employee's injury arises out of the employment. *See id.* at 826 (holding that an employee must satisfy both the "arising out of" and the "in the course of"

requirements of the Workers' Compensation Act).

■ The Workers' Compensation Act provides that "[e]very employer is liable for compensation according to the provisions of this chapter and is liable to pay compensation in every case of personal injury or death of an employee arising out of and in the course of employment without regard to the question of negligence." Minn. Stat. § 176.021, subd. 1 (2016). It is the employee's burden to demonstrate by a preponderance of the evidence that the injury arises out of and in the course of employment. *Id.*, subds. 1-1a (2016); *Dykhoff*, 840 N.W.2d at 826. Here, there is no dispute that Kubis satisfies the "in the course of" requirement. Therefore, the only requirement at issue in this appeal is the "arising out of" requirement.[4]

■ Our review of decisions by the WCCA is limited. Specifically, when we review a decision by the WCCA, we "will intrude only if, viewing the facts in the light most favorable to the findings, it appears that the findings are manifestly contrary to the evidence or that it is clear reasonable minds would adopt a contrary conclusion." *Hengemuhle v. Long Prairie*

4. For decades, we have held that the "arising out of" and the "in the course of" requirements are two distinct requirements on which the employee bears the burden of proof. *Dykhoff*, 840 N.W.2d at 826 (citing *Gibberd by Gibberd v. Control Data Corp.*, 424 N.W.2d 776, 780 (Minn. 1988)). We noted in *Gibberd*:

Since the inception of the workers' compensation law, courts have repeatedly experienced difficulty when attempting to ascertain the scope of the two phrases, "arising out of" and "in the course of." We have recognized that no one comprehensive definition can be fashioned to fit all cases and that each case must to a great extent "stand on its facts," but we have likewise recognized that a causal connection ... must exist between the injury and the employment.

424 N.W.2d at 780. "The 'arising out of' requirement 'connote[s] a causal connection' and the 'in the course of' requirement 'refers to the time, place, and circumstances of the incident causing the injury.' " *Dykhoff*, 840 N.W.2d at 826 (quoting *Gibberd*, 424 N.W.2d at 780); *see also Foley v. Honeywell, Inc.*, 488 N.W.2d 268, 271 (Minn. 1992) ("The phrase 'arising out of' means that there must be some causal connection between the injury and the employment."); *Kirchner v. Cty. of Anoka*, 339 N.W.2d 908, 911 (Minn. 1983) ("The 'arising out of' requirement refers to the causal connection between the employment and the injury. This requirement requires a showing of some hazard that increases the employee's exposure to injury beyond that of the general public."); *Swenson v. Zacher*, 264 Minn. 203, 118 N.W.2d 786, 789 (1962) (same).

*Jaycees*, 358 N.W.2d 54, 61 (Minn. 1984). We will reverse the WCCA when we "determine that the [WCCA] clearly and manifestly erred by rejecting findings supported by substantial evidence and substituting its own findings." *Dykhoff*, 840 N.W.2d at 825 (citing *Gibberd by Gibberd v. Control Data Corp.*, 424 N.W.2d 776, 779 (Minn. 1988) ("[T]he WCCA is not to substitute its view of the evidence for that adopted by the compensation judge if the compensation judge's findings are supported by evidence that a reasonable mind might accept as adequate." (citation omitted) (internal quotations marks omitted))).

The procedural, and ultimately dispositive, question presented by this appeal is whether the WCCA adhered to the appropriate standard of review when reviewing the compensation judge's findings on the "arising out of" requirement. To determine whether the WCCA was correct in substituting its own view of the evidence in place of the compensation judge's findings, we analyze the standard of review that binds the WCCA. Before the 1983 amendments to the Workers' Compensation Act, "the WCCA could, in essence, ignore th[e] findings and proceed to find the facts anew by giving little or no deference to the findings of the referees or compensation judges." *Gibberd*, 424 N.W.2d at 779. But, after the amendments,

> the [WCCA] can no longer disregard the compensation judge's findings and order. The [WCCA], instead, determines if the findings and order are supported by substantial evidence *in view of the entire record as submitted.* If the findings and order are so supported, the [WCCA] affirms. If not, then, *in that event only,* the [WCCA] may substitute its own findings, or it may remand to the compensation judge for a rehearing.

*Hengemuhle*, 358 N.W.2d at 59 (emphasis added); *see also Gibberd*, 424 N.W.2d at 779-80 (reversing the WCCA after determining that the "WCCA essentially rejected the compensation judges' [sic] findings and substituted its own" when it adopted findings "diametrically opposite" to those of the compensation judge).

Substantial evidence supports the findings when, in the context of the entire record, the findings "are supported by evidence that a reasonable mind might accept as adequate." *Hengemuhle*, 358 N.W.2d at 59. If "more than one inference may reasonably be drawn from the evidence," the WCCA must uphold the findings of the compensation judge. *Id.* at 60. The "[a]ssessment of witnesses' credibility is the unique function of the trier of fact." *Even v. Kraft, Inc.*, 445 N.W.2d 831, 834 (Minn. 1989); *Brennan v. Joseph G. Brennan, M.D., P.A.*, 425 N.W.2d 837, 839-40 (Minn. 1988). "It is not the function of a reviewing court to evaluate 'the credibility and probative value of witness testimony and to choose different inferences from the evidence than the compensation judge.'" *Pelowski v. K-Mart Corp.*, 627 N.W.2d 89, 93-94 (Minn. 2001) (quoting *Redgate v. Sroga's Standard Serv.*, 421 N.W.2d 729, 734 (Minn. 1988)). Thus, the WCCA "must give due weight to the compensation judge's opportunity to judge the credibility of the witnesses and must uphold the findings based on conflicting evidence or evidence from which more than one inference might reasonably be drawn." *Even*, 445 N.W.2d at 834 (citing *Hengemuhle*, 358 N.W.2d at 59-60).

Here, the compensation judge determined that the workplace did not expose Kubis to an increased risk of injury simply because she was ascending the stairs. Indeed, Kubis acknowledged that the cause of her fall was not due to a defect or other

unsafe condition of the stairwell.[5] After hearing the testimony, the compensation judge made a credibility determination and found that her explanation for the rushing was not credible. Finally, after making this credibility determination, the compensation judge then found that Kubis did not meet her burden to demonstrate that her employment posed an increased risk under *Dykhoff.*

The WCCA disagreed. In doing so, the WCCA divided Kubis's reason for "rushing" or "hurrying" up the stairs into two separate motivations: (1) her concern about incurring overtime, and (2) her "need to promptly report to the oncoming shift." After a review of the entire record, we conclude that the WCCA's "finding" about Kubis's need to "promptly report" to the next shift is manifestly contrary to the evidence for a simple reason: Kubis offered no evidence that she was under any pressure to hurry or to rush in order to finish her report to the oncoming shift (apart from her general concern about overtime, an explanation that the compensation judge rejected).

To the contrary, the evidence was uncontroverted that Kubis was under no pressure, had no need to hurry, and was not required to rush to finish her report. Although Kubis testified that she "was probably hurrying," she also testified that she was "not going to say that [she] wasn't hurrying, because the thought of being in trouble again was there and [she] wanted to get up to report." Then Kubis directly contradicted her own testimony that she was in a hurry to report by stating that 1) she "usually [is] not really in a hurry to

---

**5.** Thus, this case differs from *Kirchner v. County of Anoka*, in which we held that an injury caused by a fall on a staircase while leaving work arose out of employment. 339 N.W.2d 908, 911 (Minn. 1983). The dissent claims that *Kirchner* is directly on point and that the stairwell at issue in *Kirchner* was not obviously hazardous. Both of these assertions are incorrect. In *Kirchner*, the employee was navigating a stairwell that was equipped with only one handrail. *Id.* at 910. While descending the stairs, the employee was unable to use the only handrail, as it was in use by members of the public. *Id.* Without having the benefit of a handrail, the employee was unable to catch himself before he fell and was injured. *Id.* We noted in *Kirchner* that the requisite causal connection was satisfied because "the staircase was located at Kirchner's place of employment, *and* the injury occurred when the public use of the only handrail required Kirchner to negotiate the steps without benefit of that protection." *Id.* at 911 (emphasis added). We recognized in *Dykhoff* that in *Kirchner*, the "employee's injury arose out of his employment because he had to 'negotiate the steps without the benefit of' a handrail. Without the *protection of the handrail*, the employee was at an increased risk of injury." *Dykhoff*, 840 N.W.2d at 827 (emphasis added) (quoting *Kirchner*, 339 N.W.2d at 911).

Here, it is undisputed that the stairwell at CMH was equipped with handrails on both sides of the stairwell, neither of which were being used by others. Kubis also conceded that the condition of the stairs was not the cause of her injury. Accordingly, the requisite causal connection that was present in *Kirchner* is unmistakably absent here. Instead, this case is similar to *Arrowhead Senior Living Community v. Kainz*, 860 N.W.2d 379 (Minn. 2015). In *Kainz*, the WCCA "relied on two factual findings to conclude that the injury ... was compensable under the increased-risk test." *Id.* at 380. First, the WCCA held that substantial evidence supported the compensation judge's finding that there was a lack of handrails on the portion of the stairway where the employee injured her ankle. *Id.* We reviewed the record and concluded that the finding was "manifestly contrary to the evidence" because photographic evidence established that the "handrails extend[ed] all the way down the staircase." *Id.* Second, the WCCA relied on the employee's testimony that the "staircase was 'kind of steep.'" *Id.* We concluded that the compensation judge made no finding regarding the steepness of the stairs and there was "potentially conflicting evidence in the record" as to whether the stairs were "so steep that they presented a 'special hazard.'" *Id.*

get home" after the end of her shift and thus she "always [goes] in last to report"; 2) she had "never received any written warnings for working overtime" (which was confirmed by her supervisor), despite always being last to report; and 3) that night she was in authorized overtime at the time the code was called because she was completing her report (which was also confirmed by her supervisor) and was therefore already 15 minutes over her scheduled shift. Thus, the only motivation to rush or hurry that remained was Kubis's fear of overtime, which the compensation judge explicitly rejected and the WCCA did not disturb.

In short, even if the WCCA correctly split Kubis's reason for "hurrying" into two distinct "motivations," no credible evidence in the record supports the notion that she was pressured to "rush" to report to the next shift. The dissent disagrees and claims that there is evidence that Kubis was hurrying to complete the report. To the contrary, there is ample evidence in the record, consistent with the compensation judge's findings, that contradicts this alleged motivation to rush to report, including: Kubis worked overtime in 10 out of 13 two-week pay periods before her fall; Kubis had already worked 15 minutes of overtime and was in report by the time the

code was called at 11:45 p.m.; although her supervisor discussed other performance issues with Kubis, Kubis was never warned against working overtime; her supervisor approved the overtime to allow Kubis to respond to the code that night; her supervisor encouraged Kubis to work overtime when it was necessary to more thoroughly complete reporting; Kubis "always" went in to report last; and her supervisor testified that employees are not to rush or hurry their job duties to avoid working overtime. It should be apparent that there was no specific finding about Kubis's need to "rush" to complete her "report" because Kubis offered no evidence—apart from her claim that she was worried about incurring unauthorized overtime—that she was under any pressure to complete her report. Thus, although the WCCA may have believed that there were two distinct motivations for hurrying, the compensation judge correctly recognized that the only uncontradicted evidence in the record was that Kubis was concerned about incurring overtime, an explanation that the compensation judge rejected. There was no need to make additional findings about Kubis's reporting obligations because the claim of "rushing" to complete the report simply lacked credible support in the record.[6]

---

6. The dissent also focuses on the absence of a finding on the credibility of testimony that Kubis was doing her job when she was injured, stating that "the compensation judge had made *no finding* on the credibility of Kubis's testimony that she wanted to finish her report to the incoming nurses, which was plainly part of her work." But, contrary to the dissent's assertion, to the extent that Kubis's claim rests on no more than her obligation to do her job by reporting to the next shift, this theory of "arising out of" is akin to the positional-risk theory that we rejected in *Dykhoff* because it impermissibly collapses the separate "arising out of" and "in the course of" requirements into a single test that asks only whether the employee was working at the time of the injury. *See Dykhoff,* 840 N.W.2d at 828-29, 828 n.4. We rejected this theory because we have "declined to 'make the employer an insurer against all accidents that might befall an employee in his employment.'" *Id.* (quoting *Auman v. Breckenridge Tel. Co.,* 188 Minn. 256, 246 N.W. 889, 890 (1933)). The dissent offers no persuasive reason for us to abandon this precedent, particularly in the face of legislative silence after *Dykhoff. See Schuette v. City of Hutchinson,* 843 N.W.2d 233, 238 (Minn. 2014) ("We are extremely reluctant to overrule our precedent absent 'a compelling reason.' The doctrine of stare decisis has special force in the area of statutory interpretation because the Legislature is free to alter what we have done." (quoting *State v. Martin,* 773 N.W.2d 89, 98 (Minn. 2009))).

We are mindful of our limited scope of review of a decision from the WCCA and that we must view the facts in the light most favorable to the findings of the WCCA. *Hengemuhle*, 358 N.W.2d at 60-61. Here, the findings of the compensation judge are supported by substantial evidence that, in view of the entire record as submitted, a reasonable mind would accept as adequate. When examined in light of the entire record, because Kubis failed to demonstrate by a preponderance of the evidence that her job required her to "rush" or "hurry" to finish a report to the next shift, the WCCA was required to affirm the compensation judge's findings.

Even accepting the WCCA's decision to artificially divide Kubis's explanation for why she needed to rush into separate components, the WCCA exceeded its standard of review, particularly because the compensation judge did not find the testimony offered by Kubis regarding her concerns about overtime to be credible. Because we hold that the WCCA clearly and manifestly erred by rejecting the findings of the compensation judge, we need not address the second step from *Hengemuhle*, analyzing whether the findings of the WCCA should be affirmed.

## CONCLUSION

We reverse the decision of the Workers' Compensation Court of Appeals and reinstate the decision of the compensation judge.

Reversed.

Dissenting, Lillehaug, Chutich, and McKeig, JJ.

1. Kubis made clear in her testimony that she had two reasons: "And it wasn't just that I was afraid of the overtime. I wanted to report

## DISSENT

LILLEHAUG, Justice (dissenting).

The opinion of the court does not give the Workers' Compensation Court of Appeals the long-established deference accorded by our case law. If that deference were given, the employee would be entitled to workers' compensation benefits based on our precedent directly on point, *Kirchner v. County of Anoka*, 339 N.W.2d 908 (Minn. 1983). Therefore, I respectfully dissent.

### I.

The story of Kristel Kubis's workplace injury is not complicated. Nurse Kubis was nearing the end of her shift on the second floor of the hospital. While "in report"—telling the incoming nurses about developments that occurred during her shift—Kubis responded to a "code," or medical emergency, on the ground floor. When the code was over, rather than taking the elevator as she usually did due to a history of knee injury, Kubis decided it would be faster to take the stairs. While hurrying up the stairs, she tripped and fell, injuring her shoulder and arm.

Kubis testified about her reasons for taking the stairs. She did so for two reasons: (1) she wanted to avoid overtime (which she said was discouraged); and (2) she wanted to finish her report to the incoming nurses.[1] The compensation judge found that her testimony about wanting to avoid overtime was not credible. The compensation judge did not make any finding, one way or the other, on the credibility of her testimony that she hurried up the stairs to finish her report to the incoming nurses.

off to the next crew." She told the group responding to the code: "I have to go. I want to get up and report."

The parties agreed that Kubis's injury arose "in the course of" her employment. They disagreed about whether the injury was one "arising out of" her employment. The compensation judge held that it was not, and thus denied benefits.

Kubis's appeal was heard and decided by the WCCA sitting en banc. Unanimously, the WCCA ruled that Kubis's injury arose out of her employment and, thus, she was entitled to benefits.

The court now reverses the WCCA, and reinstates the decision of the compensation judge, on the theory that the WCCA exceeded its power of review by improperly substituting its own view of the evidence. I disagree.

## II.

In my view, the WCCA's opinion is thorough, well-reasoned, and correct in all respects.

First, the WCCA accurately described its standard of review. Quoting Minn. Stat. § 176.421, subd. 1 (2016), the WCCA acknowledged that it may not set aside the compensation judge's factual findings unless they are "clearly erroneous and unsupported by substantial evidence." *Kubis v. Cmty. Mem'l Hosp. Ass'n*, No. WC15-5842, 2016 WL 845830, at *2 (Minn. WCCA Feb. 5, 2016). It also cited the applicable case from our court, *Hengemuhle v. Long Prairie Jaycees*, 358 N.W.2d 54, 59-60 (Minn. 1984), which recognized and elaborated on the special standard of review created by statute for workers' compensation cases. Minnesota Statutes § 176.421, subd. 6(3) (2016), grants the WCCA the power to "substitute for the findings of fact made by the com-

pensation judge findings based on the total evidence."

Second, the WCCA correctly applied its standard of review. The WCCA did not set aside a single factual finding of the compensation judge. Indeed, the WCCA assumed what the compensation judge had found: that Kubis ran up the stairs.[2] *Kubis*, 2016 WL 845830, at *1.

On the issue of why Kubis ran up the stairs, the WCCA specifically declined to disturb the compensation judge's credibility determination that Kubis was not motivated by concern about overtime. *Id.* at *5. The WCCA correctly noted, however, that the compensation judge had made *no finding* on the credibility of Kubis's testimony that she wanted to finish her report to the incoming nurses, which was plainly part of her work. *Id.* The evidence of that motivation, said the WCCA, was "uncontroverted." *Id.* As a result, the WCCA was right to conclude and hold: "Where an employee who normally avoids the stairs due to prior knee problems, takes them because she feels rushed to report to the next shift, and in the process runs up the stairs and falls, the arising out of element is established." *Id.*

It is our court, not the WCCA, who misapplies the standard of review. As *Hengemuhle* recognized, findings of the WCCA are entitled to deference. The WCCA "is a specialized agency of the executive branch, its members selected for their experience and expertise." 358 N.W.2d at 61. When the WCCA makes findings, our review is "limited," and we must review those findings in a "most favorable" light. *Id.* at 60-61.

Although the court acknowledges the "most favorable" standard, it does not ap-

---

2. *See* Comp. Judge Finding 5 ("At the completion of the code, the employee elected to go to the upper floor by running up the stairs because she believed it would be faster than waiting for an elevator. While running up the stairs, the employee fell and sustained an injury to her right shoulder.").

ply it. Instead, substituting its own judgment for that of the WCCA, the court ignores evidence that Kubis rushed up the stairs to complete the report. Specifically, Kubis testified: "And it wasn't just that I was afraid of the overtime. I wanted to report off to the next crew." This alone is enough to prove that her injury arose out of her employment. Whether or not her employer *pressured* her to rush makes no difference. As the WCCA determined, record evidence that Kubis hurried up the stairs to complete her work establishes a solid causal connection between employment and injury.

Not following the principle of limited review of WCCA findings, the court flyspecks Kubis's testimony to find a contradiction where none exists. Kubis testified that she "was probably hurrying" and that she was "not going to say [she] wasn't hurrying, because the thought of being in trouble again was definitely there and [she] wanted to get up to report." The court claims that these statements were "directly contradicted" by Kubis's testimony that she "usually [is] not really in a hurry to get home" and "always [goes] in last to report," that she received no warnings for working overtime, and that her overtime on the night of the injury was authorized. But Kubis's explanation of what she "usually" did at the end of her shifts does not muddy her repeated testimony that, on the night she was injured, she was hurrying to report to the next shift. In any event, if there was a contradiction, it was for the WCCA, not this court, to resolve.

In other words, the WCCA accurately discerned that the evidence of Kubis hurrying to report to the next shift was uncontroverted, and that the compensation judge had failed to make a finding on that evidence and its connection to her work. So the WCCA made its own finding. Our

court should have shone a favorable light on it.

### III.

If the court had properly applied the *Hengemuhle* standard of review for WCCA findings, Kubis's injury would have been covered and she would have received benefits. We have precedent directly on point: *Kirchner v. County of Anoka*, 339 N.W.2d 908 (Minn. 1983), another case of injury from a stairway fall. The facts are remarkably similar to this case.

Kirchner was a government employee. *Id.* at 910. His leg had given out on prior occasions. *Id.* One day, when leaving work, he came to the interior staircase of the Anoka County Courthouse. *Id.* The staircase handrail was being used by people ascending the stairs. *Id.* Rather than wait until the handrail was available, Kirchner went to the other side of the staircase and walked down the stairs. *Id.* His leg gave out, he fell, and he was injured. *Id.*

We held that Kirchner's injury arose out of his employment, based on the facts that he was leaving work, he had a history of leg and back issues, the staircase was at his place of employment, he decided not to wait to use the handrail, he went down the stairs, and he fell and was injured. *Id.* at 911. That was enough to demonstrate the "requisite causal connection between the employment and the injury." *Id.*

*Kirchner* applies here. Kubis was working. She had a history of knee injury. Rather than wait to use the elevator, she took the stairs. She hurried up the stairs, tripped, fell, and was injured. That is enough to demonstrate the requisite causal connection between her employment and her injury. Kirchner's and Kubis's situations are similar in all relevant respects.

The majority attempts to distinguish *Kirchner* from this case with the following

quotation from *Kirchner*: "the staircase was located at Kirchner's place of employment, and the injury occurred when the public use of the only handrail required Kirchner to negotiate the steps without benefit of that protection." *Id.* This, the majority claims, shows that *Kirchner*'s holding hinged on a particular feature of the stairway: its single handrail. But this strained reading is undone by the same paragraph in *Kirchner* from which the quotation is drawn. That paragraph cites two cases holding that employees' stairway injuries arose out of employment: *Miller v. Goodhue-Rice-Wabasha Citizens Action Council, Inc.*, 293 Minn. 454, 197 N.W.2d 424 (1972), and *Barlau v. Minneapolis-Moline Power Implement Co.*, 214 Minn. 564, 9 N.W.2d 6 (1943). In each case, an employee's pre-existing injury (not any stairway feature) was the sole cause of a fall that resulted in injury. *Miller*, 197 N.W.2d at 424; *Barlau*, 9 N.W.2d at 7. *Miller* is especially relevant, as it concerned an employee whose pre-existing leg injury caused him to fall while ascending steps that presented no hazard. 197 N.W.2d at 424. *Kirchner*'s citation of *Miller* shows that Kubis did not need to prove that the stairway upon which she fell was especially hazardous. Nor should she need to prove that. The Workers' Compensation Act expressly states that it shall be applied "without regard to the question of negligence." Minn. Stat. § 176.021, subd. 1 (2016).

The compensation judge, too, did not apply *Kirchner*. Instead, he read *Dykhoff v. Xcel Energy*, 840 N.W.2d 821 (Minn. 2013), as establishing some sort of stricter "arising out of" test. To the contrary: *Dykhoff* specifically cited *Kirchner* with approval, for the common-sense proposition that "[t]he 'arising out of' requirement can be satisfied even when the workplace condition connected to the injury is not obviously hazardous." *Dykhoff*, 840 N.W.2d at 827. Neither Kirchner's nor Kubis's stairways were obviously hazardous.[3]

Here, as the WCCA found and held, a nurse with a history of knee injury hurried up her employer's stairs while working, tripped, fell, and was injured. There is a sufficient causal connection between the employment and the injury.

## IV.

This case—like *Dykhoff*, a 4-3 decision—is another example of the difficulties the workers' compensation bar, compensation judges, the WCCA, and we are having interpreting and applying the "increased risk" test. There may be a better alternative: the positional-risk test.[4]

Under the positional-risk test, an employee satisfies both the "arising out of" and "in the course of" requirements without regard to risk if the injury would not have occurred but for the fact that the conditions and obligations of the employer placed the employee in the position where the employee was injured. *See* 1 Lex K.

---

**3.** In any event, *Dykhoff* is readily distinguishable from this case. The employee in *Dykhoff* had no history of injury, walked normally on a normal floor, and yet fell and was injured. Essentially, *Dykhoff* was an unexplained injury case. Speaking for myself, and not for the justices joining me in this dissent, I remain of the view that, in *Dykhoff*, there was a sufficient causal connection between the employment and the injury. *See Dykhoff*, 840 N.W.2d

at 837 (Lillehaug, J., dissenting) (joined by Stras, J.).

**4.** Indeed, at the end of the memorandum attached to his Findings and Order, the compensation judge in this case noted: "Inasmuch as the employee was on the employer's premises and traveling to a location on these premises designated for her to log off from her employment shift, a positional risk standard might be satisfied."

Larson, *Larson's Workers' Compensation Law* § 3.05 (Matthew Bender Rev. Ed. 2016). A majority of states confronted with the issue have adopted the positional-risk test. *See id.* § 7.04[1][a].

In his dissent in *Dykhoff*, Justice Page, joined by Justice Stras, made the case that Minnesota should adopt the positional-risk test. 840 N.W.2d at 834-35 (Page, J., dissenting). But the issue had not been fully briefed. *See id.* at 837 (Lillehaug, J., dissenting). When the issue is presented squarely and briefed, we should welcome the opportunity to consider whether Minnesota should join the states that have adopted the positional-risk test.

CHUTICH, Justice (dissenting).

I join in the dissent of Justice Lillehaug.

MCKEIG, Justice (dissenting).

I join in the dissent of Justice Lillehaug.